BATES *vs.* ILLINOIS CENTRAL RAILROAD COMPANY.

1. In ejectment for land bounded by a river which has changed its bed and formed a new channel since the date of the survey, it is proper for the court to let the jury find whether the land in controversy is within the tract surveyed and granted.

2. The jury is bound to find the river boundary to be where the plat of the survey and the field-notes have designated it, though in fact the river had at the time of the survey another channel through which its waters generally flowed.

3. It is not material in such a case where the most usual channel of the river was, nor whether the channel recognised in the survey and field-notes was natural or artificial, constant or occasional.

4. The public, by the act of the proper officer, had a right to fix and declare the place of the river for the purposes of a survey and sale of the lands, and a grantee cannot contradict the survey and claim beyond it by showing that the true channel of the river was really at another place.

5. This court will not decide what are the rights of lake shore proprietors whose fronts are swept away by the currents, nor to what extent they still own the lands covered with water, except in the case of one who proves that he owned the land before the decretion took place. Until the party shows his ownership of the shore all inquiry respecting his rights in or under the waters adjoining is speculative and useless.

Writ of error to the Circuit Court of the United States for the northern district of Illinois.

This was ejectment in the Circuit Court brought by George C. Bates against the Illinois Central Railroad Company for a parcel of land called the "Sand Bar," now covered with water, and which the plaintiff alleged in his declaration was a part of the north fraction of section 10, town 9, in the city of Chicago.

The plaintiff's title to the north fraction of section ten was not contested. The section was surveyed by public authority in 1821. This fraction was pre-empted in 1831 by Robert A. Kinzie, to whom a patent for it according to the survey was issued in 1837. The plaintiff held Kinzie's title.

But the defendant denied that the Sand Bar in dispute was within the proper limits of the plaintiff's fraction. The Chicago river is one of the boundaries called for by the survey and patent. Great changes have taken place in the bed and mouth of the river during thirty years. What these changes were, and when they took place, were subjects on which much evidence was given by both parties. If the bed and mouth of the river were at the place where they are laid down in the plat of the survey and mentioned in the field-notes, then the plaintiff's tract did not include the Sand Bar for which he brought suit. The Circuit Court left it to the jury to say, as matter of fact, what were the true boundaries of the tract, and whether the Sand Bar was or was not included by them.

Previous to the erection of the piers in Chicago harbor, (which commenced in 1833,) the land in controversy was dry, but afterwards the currents created by those piers washed it away, and it gradually sunk beneath the waters of the lake. The plaintiff asserted, as matter of law, that his title was not changed or divested by that fact. The court charged the jury that, assuming the plaintiff to be the owner of the land when it was above water, if he suffered it to be gradually washed away until it was entirely covered, and then permitted it to remain an open roadstead for more than seven years, the title became vested in the public, and he could not recover.

To these rulings of the Circuit Court exceptions were taken, and the verdict and judgment being for the defendant, the plaintiff brought the cause up to the Supreme Court by writ of error.

Upon the point last mentioned—namely, the destruction of the plaintiff's title by the action of the water and by his failure to reclaim it from the bottom of the lake for more than seven years—the arguments here were very elaborate. But it will be seen by the opinion of Mr. Justice *Catron* that the cause turned entirely on the question of boundary, which was submitted to the jury, and found against the plaintiff on evidence regarded as conclusive.

*Mr. Wills*, of Illinois, for plaintiff in error.

*Bates* vs. *Illinois Central Railroad Company.*

*Mr. Joy*, of Michigan and *Mr. Noyes*, of Illinois, for defendant in error.

Mr. Justice CATRON. This cause comes here by writ of error to the Circuit Court of the United States for the northern district of Illinois. The railroad company is sued in ejectment by Kinzie's representatives for land lying under water at the city of Chicago; the end of the road running into Lake Michigan. The controversy depends on the following charge of the court to the jury:

"By the act of Congress of July 1, 1836, entries of the character of Kinzie's were confirmed, and patents were to be issued therefor, as in other cases. A patent accordingly issued to Kinzie on the 9th of March, 1837. There can be no reasonable doubt, I think, that *this title, thus perfected, related back to the entry of Kinzie in May*, 1831, and the law gave it effect from that date precisely as if it had been made in the proper land office.

"The land had been surveyed in 1821, and on the plat of the Government survey the north fraction of section 10 is represented as having the Chicago river on the south, and Lake Michigan on the east. The river is represented as flowing out in *nearly a straight line into the lake*. The fact seems to be, that from 1816 to 1821 the river, instead of flowing out, as represented on the survey, just before it entered the lake, made a sharp curve to the south, and thereby formed a sand-bar or spit of land between it and the lake, which has given rise to this controversy. This sand-bar existed in 1821, but it is not noticed in the plat of the survey. In 1821, the river seems to have run into the lake, according to the plat, but it is said this was in consequence of an artificial channel cut through the sand-bar. This channel was stopped up in the winter of 1821-2, but was opened again in the spring of 1822 by a freshet, and water continued to flow out there in the summer of 1822; but during 1821 and 1822 more or less water passed from what had been the mouth prior to 1821. After 1822, the direct channel was stopped up, and, with an occasional exception, caused by the act of man or by a freshet, the river flowed

into the lake up to 1833 in its original and natural bed. In 1833 and in 1834 the Government constructed piers across the sand-bar, and the river from that time has flowed through those piers; the old channel south of the pier having ceased to bear the waters to the lake, because the south pier was run across it, as well as across the sand-bar. In the construction of the piers, the Government of the United States did not purchase or condemn the land, but Kinzie seems to have acquiesced in the act; and, indeed, as already stated, it was not till 1836 that Kinzie's title was confirmed."

An exception was taken to the concluding part of the charge, which is as follows:

"Under this state of facts, the substantial truths of which are not denied, the land of Kinzie, covered by his entry and purchase, would be the tract within the following boundaries, as they existed at the time of the entry, (there being no question made, but that the Government plats, by which sales were made, show that the whole land north of the river and south of the north line of the fraction was sold as one parcel,) and are the north line and west line of fractional section 10, according to the public survey, and the Chicago river and Lake Michigan, as they existed; that is, it would include all the dry, firm land there was at that time between the west line of the section and the lake, and the north line of the section and the river. The river, the lake, and the two lines of the fractional section 10 constituted the boundaries. Whether the land in controversy was within these boundaries is a fact to be found by the jury, depending upon the evidence before them."

The facts as recited were not disputed; nor is any exception taken to the statement made, preceding the court's conclusion on the law and facts of the case.

The land trespassed on and sued for, as described in the plaintiff's declaration, lies south of the south pier, is now covered with water, and a part of the bottom of the lake; on which land the end of the railroad is located. It was formerly overlaid with the sand-bar, which was swept away by the current the piers created. It is situated outside of fractional section ten, as its boundary was described by the judge to the jury. And this raises the question, by what rule is the pub-

lic survey to which the patent refers for identity to be construed? The land granted is 102 29-100 acres, lying north of the Chicago river, bounded by it on the south, and by the lake on the east. The mouth of the river being found, establishes the southeast corner of the tract. The plat of the survey, and a call for the mouth of the river in the field-notes, show that the survey made in 1821 recognised the entrance of the river into the lake through the sand-bar in an almost direct line easterly, disregarding the channel west of the sand-bar, where the river most usually flowed before the piers were erected. It is immaterial where the most usual mouth of the river was in 1821; nor whether this northern mouth was occasional, or the flow of the water only temporary at particular times, and this flow produced to some extent by artificial means, by a cut through the bar, leaving the water to wash out an enlarged channel in seasons of freshets. The public had the option to declare the true mouth of the river, for the purposes of a survey and sale of the public land. And the court below properly left it to the jury to find whether land on which the railroad lies is within the boundary of the tract surveyed and granted. According to the judge's construction of the plat and calls, and the patent bounded on the survey, the jury was bound to find for the defendant, and therefore this ruling was conclusive of the controversy.

In regard to the matter so much and so ably discussed in the argument here, as to the rights of proprietors on the lake shore, where their fronts were swept away by currents, and to what extent they still owned the lands covered with water, undoubtedly theirs before the decrease took place, we do not feel ourselves called on to decide, because this plaintiff was not the owner of the land sued for before the decrease occurred, and could have no proprietary rights in the bottom of the lake. Before a proprietor can set up his claim to accretions and the like, he must first show that he owns the shore; and if he fail first to establish his ownership, judicial inquiry respecting his rights in or under the waters adjoining are abstractions and useless.

*Judgment of the Circuit Court affirmed.*