Argued July 15, affirmed in part; reversed in part September 9,
1974, petition for review pending

# STATE ᴇx ʀᴇʟ STATE LAND BOARD, *Appellant–Cross-Respondent, v.* CORVALLIS SAND AND GRAVEL COMPANY (No. 21512), *Respondent–Cross-Appellant.*

526 P2d 469

*Peter S. Herman,* Senior Counsel, Salem, argued the cause for appellant–cross-respondent. With him on the briefs were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

*Robert Mix,* Corvallis, argued the cause and filed the briefs for respondent–cross-appellant.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

SCHWAB, C. J.

This is an action at law in ejectment by the state pursuant to ORS 105.005, et seq., to recover possession of 11 described parcels of real property constituting portions of the bed of the Willamette River near Corvallis, and to recover damages for the reasonable value of the use of such parcels.

In 1958 the state filed a suit to quiet title to the land adjoining certain lots, which lots constitute a portion of the property in dispute now. In 1959, at trial, the case was dismissed without prejudice on motion for a voluntary nonsuit for failure of proof. In 1960 the state filed a suit for an accounting and an injunction covering the area in dispute in the case at

bar. This case was voluntarily dismissed in 1961 by the state before it was at issue.

The first complaint in this action was filed by the state on June 7, 1965. In the complaint the portion of the riverbed in dispute was described as one parcel; the portions of the riverbed now constituting Parcels 2A, 2B and 2C were omitted. Instead of answering, the defendant filed a complaint in equity seeking to permanently enjoin the state's ejectment action. The state demurred to the complaint. The trial court overruled the demurrer and a decree was entered in favor of Corvallis Sand and Gravel. On appeal the Supreme Court reversed. *Corvallis Sand & Gravel v. Land Board,* 250 Or 319, 439 P2d 575 (1968).

On December 23, 1969, the plaintiff filed its first amended complaint in ejectment in which it described the riverbed it sought to recover as 11 separate parcels and claimed damages for the use of each parcel. On July 7, 1970, the defendant filed its answer, denying the allegations of the complaint and raising 12 affirmative defenses. After procedural disputes leading to several amended answers, trial was held before the court without a jury, commencing October 11, 1971.

On May 25, 1972, the trial court issued a memorandum opinion awarding various parcels to each party and setting the amount of damages for the previous use by defendant of those parcels awarded to the state. Findings of fact and conclusions of law were entered on June 19, 1972. The court supplemented these findings on July 28, 1972, and judgment was entered the same day. The state appeals from that portion of the order which awards parcels described for the purposes of this litigation as 2A, 2B and 2C to

the defendant, on the ground that it erred in finding that these parcels were formed by avulsion, and from the failure of the trial court to award interest on the money judgment from the date of taking by defendant to the date of the judgment. The defendant cross-appeals from a variety of procedural rulings of the court, and the striking of certain of its affirmative defenses, the award of certain parcels to the state, and the award of damages. For the reasons which follow, we affirm the trial court in all its rulings and its judgment with the exception of one relatively minor item of damages which we reverse.

## I.  Scope of Review

■ The scope of appellate review of the facts presented in this case was stated in *Reif v. Botz,* 241 Or 489, 496, 406 P2d 907 (1965):

> "* * * On appeal in an action at law from findings of fact by a trial court sitting without a jury, this court cannot again place the evidence on the scales to see which side preponderates. We must confine ourselves to a search of the record for some evidence to support the findings. If we so find * * * those findings cannot be disturbed."

*See also, May v. Chicago Insurance Co.,* 260 Or 285, 490 P2d 150 (1971); *State Highway Com. v. DeLong Corp.,* 9 Or App 550, 495 P2d 1215, Sup Ct *review denied* (1972), *cert denied* 411 US 965 (1973). The various findings of fact as to the formation of the various parcels and the amount of material removed from each parcel must be reviewed in light of this standard.

■ Much of the dispute in this case centers around the difference in testimony of the expert witnesses of the parties. The credibility of the various witnesses

and the weight to be given to their testimony is a matter for the trial court and will not be passed upon again by this court in a law action. *Armbrust v. Travelers Ins. Co.*, 232 Or 617, 376 P2d 669 (1962).

Finally, we should note that when we state facts in this case, we are using the findings of fact of the trial court in all instances in which there is a conflict in the evidence.

## II. Ownership of the Parcels in Dispute

This litigation involves ownership questions of certain parcels of the bed of the Willamette River[1] near Corvallis, Oregon, which parcels lie between ordinary high watermarks in an area bounded by the Mary's River on the north or downstream end, and the City of Corvallis Water Treatment Plant to the south or upstream end. For the purposes of this litigation, the state, in its complaint, divided this section of the river into 11 separate parcels.[2] On appeal, the ownership of eight of these parcels is in issue.

In order to put the ownership question into perspective, a brief overview of the facts is necessary. Prior to the latter part of 1909, the northerly portion of the Willamette River now shown on the attached map as the East Channel was the main channel of the river. Prior to 1909 the main channel veered to the east from a point just south of what is shown as Par-

---

[1] Neither party contests the fact that the Willamette River is navigable in the area involved in this litigation. For a comprehensive view of the geography of the disputed area, *see* map at 532.

[2] For a discussion of the propriety of splitting the disputed area into separate parcels and causes of action, *see* pp 559-561, infra.

cels 2A, 2B and 2C, went around the east side of Fischer Island and rejoined what is now the main

channel at a point to the northwest of Parcels 2A, 2B and 2C. The area shown on the map as Parcels 2A, 2B and 2C, and described as the Fischer Cut area was a minor non-navigable channel which was submerged only seasonally. However, following a storm and flood

in late 1909, the area known as Fischer Cut became the main channel of the river and the East Channel gradually became non-navigable.

With regard to Parcels 2A, 2B and 2C, the issue involves the consequences of this change of channels, with the state claiming ownership by virtue of its sovereignty over navigable waters and the application of an erosion principle. The defendant contends that the change was actually avulsive and that, in any event, the state's sovereignty does not extend to the bed of the river included within these parcels.

With regard to other of the parcels the issue is who was holder of the original title. Finally, with some parcels, the issue arises because of formations of islands within the bed of the river, accretions thereto, removal of gravel deposits by the railroad, the construction of a wingdike in 1948 by the Army Corps of Engineers, and the general erosive and accretive processes of the river over the course of time.

The trial court awarded Parcels 2A, 2B and 2C to the defendant, and all the others to the state. Both parties raise a variety of factual and legal contentions in opposition to the findings and conclusions of the trial court. We will treat each parcel separately recognizing that, to some degree, the factual discussion as to each parcel will overlap somewhat the general discussion above.

A. Parcels 2A, 2B and 2C (Fischer Cut)

As indicated on the map, Parcel 2A is comprised of bottom land of the Willamette River between ordinary low water. Parcel 2B is riverbed between ordinary high and ordinary low water on the right bank

of the river. Parcel 2C is riverbed between the ordinary high water and ordinary low water on the left bank of the river. The trial court made the following findings of fact concerning the area within the Fischer Cut:

"1. Fischer Island from 1853 to 1909 was a peninsula-like formation around which the Willamette River coursed.

"2. By 1890 a clearly discernible overflow channel over the neck of the peninsula had developed known as Fischer Cut.

"3. In 1890 Fischer Cut would have had to be cleared of driftwood and willow growth before it could possibly accommodate the flow of the river. The Fischer Cut Channel was dry at low water, or below the five-foot stage, and carried water only at intermediate or high stages of the river.

"4. In January of 1906 the Fischer Cut Channel was in practically the same location as it was in 1890. It was estimated then that roughly one-quarter of the flow of the river was carried through Fischer Cut.

"5. Between 1890 and 1909 the high water overflow through Fischer Cut did not sufficiently clear Fischer Cut to allow for the full flow of the river and the river continued to flow around Fischer's Island during that period.

"6. As the result of a flood of November 25, 1909, the river suddenly and with great force and violence converted Fischer Cut into the main channel of the river.

"7. The change was not gradual and imperceptible but was a rapid and violent change of course, avulsive in character and constituted an avulsion.

"8. Parcels 2A, 2B and 2C combined are included in the area known as Fischer Cut."

The state argues that ownership of the entire Fischer Cut area passed to the state by virtue of its

sovereignty over navigable waters regardless of the manner of the formation of the cut. It also argues that regardless of the state's sovereignty, title to the Fischer Cut river bottom passed to the state because the Fischer Cut did not result from an avulsive change since an existing channel of the river was present prior to its enlargement. Defendant argues that the change was avulsive and that, in any event, *Bonelli Cattle Co. v. Arizona,* 414 US 313, 94 S Ct 517, 38 L Ed 2d 526 (1973), controls the ownership question.

1. The Sovereignty Issue

■ Under the equal-footing doctrine, as new states were admitted to the Union, they entered with the same rights, sovereignty and jurisdiction as the original states possessed within their respective borders. Accordingly, under the equal-footing doctrine, title to the lands beneath navigable waters passed from the federal government to the state of Oregon upon its admission to the Union. *Bonelli,* 38 L Ed 2d at 534; An Act for the Admission of Oregon into the Union, ch 33, 11 Stat 383. Further, under the Submerged Lands Act, 43 USC § 1301 (a) (1), the federal government quitclaimed all federal title to lands beneath navigable streams, as modified by accretion, erosion or reliction. By virtue of its sovereignty over navigable waters, the state contends that its title to the bed of the Willamette River follows the course of the river wherever it may move. Otherwise, the state argues, the bed will become a "checkerboard" of public and private ownership, seriously impairing the public use of the waters.

Questions of title to beds of navigable rivers must be evaluated in light of *Bonelli Cattle Co. v. Arizona,* supra. In *Bonelli,* the Supreme Court recog-

nized the principle that it would be left to the states to determine what rights they would accord riparian owners in the beds of navigable streams which under federal law belong to the state. However, the question of how far the state's sovereign right extends under the equal-footing doctrine and under the Submerged Lands Act was found to involve a question of right asserted under federal law and, thus, federal common law would apply.

While *Bonelli* involved title to lands formerly under the main channel that had since become dry, the basic public policy discussion is equally applicable to the case where certain lands which were not under water are presently under water. The court in *Bonelli* first noted that, historically, title to the beds beneath navigable waters is held by the sovereign as a public trust for protection of navigation and related purposes. The court continued:

> " 'Such waters * * * are incapable of ordinary and private occupation, cultivation and improvement; and their natural and primary uses are public in their nature, for highways of navigation and commerce, domestic and foreign, and for the purpose of fishing * * *.' Shively v. Bowlby * * * [152 US 1, 11, 38 L Ed 331, 14 S Ct 548 (1894)]."
>
> "The State's title is to the 'riverbed as a bed' * * *." *Bonelli Cattle Co. v. Arizona,* supra, 414 US at 322.

The fundamental purpose of the original grant involves navigational and related interests and the state can often protect these interests by holding a navigational servitude rather than by holding title to the bed.[9]

---

[9] The court directs the reader to Note, *Artificial Additions to Riparian Land: Extending the Doctrine of Accretion,* 14 Ariz L

While the extent of the state's interest should not be narrowly construed because it is denominated a navigational purpose, *see, Bonelli Cattle Co. v. Arizona,* supra, n 15, the implication is clear that the other purposes must somehow be related to the navigational purpose.

The only public purpose cited by the state deals with the question of public recreation in terms of wading, fishing, boating or swimming. However, such rights can be controlled under the navigational purpose doctrine, and title to the bed, asserted here only for the extraction of royalty payments, is not necessary. Certainty of title and other arguments raised by the state under its sovereignty argument do not relate to this legitimate state interest in control of navigation and fishing.

▮ The first portion of *Bonelli* thus stands for several basic propositions. First, the extent of title to submerged lands and navigable waterways must be determined by federal common law. Second, the state's interest in the bed of navigable waters is basically that of the control of navigation, fishing and other related public goals. So the sovereignty principle alone will not support title of the state in these parcels. Thus we must turn to *Bonelli* and other federal cases to determine whether title to the bed passed to the state under the facts presented in the case at bar.

2. Nature of the Change in the River's Course

The court in *Bonelli* first noted that federal law recognizes the doctrine of accretion whereby the

Rev 315 (1972), wherein the author speaks in terms of title being burdened with the state's "navigational easement." *See,* Bonelli Cattle Co. v. Arizona, 414 US 313, 94 S Ct 517, 38 L Ed 2d 526, 536, n 12 (1973).

grantee of land bounded by a body of navigable water acquires a right to any gradual accretion formed along the shore. The court then discussed a number of inter-related policy reasons for the application of doctrine of accretion, which reasons refer to the risk a riparian owner runs that his land could be eroded by the action of the adjoining waterway. Under the court's analysis loss of land on a navigable waterway by a riparian owner to erosion would result in title to the bed passing to the state. *See, Bonelli Cattle Co. v. Arizona,* supra, 414 US at 317, 321-24.

■ As defined in *Bonelli,* 414 US at 325, and other federal cases,[4] the doctrine of accretion requires the gradual, imperceptible accumulation of land on a navigable river bank. As found by the trial court and admitted by the state, there was no gradual addition or accumulation of land in this case. Rather, the river started to flow through a new channel. Since the accretion doctrine does not apply, the question is what this change to a new channel is denominated under federal common law and how such a change affects title to the riverbed.

One possibility is that this change was avulsive, as found by the trial court. As defined in *Bonelli,* 414 US at 326-27, an avulsion occurs where a stream suddenly and perceptibly abandons its old channel. Other federal cases state that such change must be visible in its progress. *See, St. Louis v. Rutz,* 138 US 226, 11 S Ct 337, 34 L Ed 941 (1891). Such an avulsive change does not affect title to the lands submerged by the water since this is not one of the risks run by a nonriparian landowner. *Bonelli Cattle Co. v. Arizona,*

[4] *See,* Philadelphia Co. v. Stimson, 223 US 605, 32 S Ct 340, 56 L Ed 570 (1912).

supra; *Philadelphia Co. v. Stimson,* 223 US 605, 32 S Ct 340, 56 L Ed 570 (1912); *St. Louis v. Rutz,* supra. While title does not change, the submerged lands do become subject to the public right of navigation, fishing and other related public purposes. *See* discussion, supra, at 536-37. The trial court found that the change in the Fischer Cut area was sudden and perceptible and, thus, constituted an avulsion. We find evidence in the record to support this conclusion.[9]

But even if the doctrine of avulsion does not adequately fit the facts in the case at bar, there is a middle course between the avulsion and accretion doctrines which perhaps more accurately reflects the facts presented. This is the so-called exception to the accretion rule announced in *Commissioners v. United States,* 270 F 110, 113-14 (8th Cir 1920):

> "* * * [The accretion rule] is applicable to and governs cases where the boundary line, the thread of the stream, by the slow and gradual processes of erosion and accretion creeps across the intervening space between its old and its new location. To this rule, however, there is a well-established and rational exception. It is that, where a river changes its main channel, not by excavating, passing over, and then filling the intervening place between its old and its new main channel, but by flowing around this intervening land, which never

---

[9] The state relies heavily upon Purvine v. Hathaway, 238 Or 60, 393 P2d 181 (1964), to support its position that this change was not avulsive in nature. First, it should be noted that federal common law controls ownership questions under *Bonelli* and, thus, state cases are of limited applicability. Second, *Purvine* did not involve the question of the state's ownership of the riverbed but rather involved boundary questions. Finally, the court found that an avulsive change had not been proved on the facts and that, for policy reasons, the court did not wish to apply the avulsion theory because of the effect that theory could have on boundary questions in the future.

> becomes in the meantime its main channel, and the change from the old to the new main channel is wrought during many years by the gradual or occasional increase from year to year of the proportion of the waters of the river passing over the course which eventually becomes the new main channel, and the decrease from year to year of the proportion of its waters passing through the old main channel until the greater part of its waters flow through the new main channel, the boundary line between the estates remains in the old channel subject to such changes in that channel as are wrought by erosion or accretion while the water in it remains a running stream * * *."

While the court treated this as a form of accretion, the result is the same as avulsion in that the boundary line was found not moved to the new main channel but rather remained in the old main channel. In fact, at least one court claims that the rule in *Commissioners* was a rule of avulsion. *See, Durfee v. Keiffer,* 168 Neb 272, 95 NW2d 618 (1959). The rule of *Commissioners* was apparently recognized in *Kansas v. Missouri,* 322 US 213, 64 S Ct 975, 88 L Ed 1234 (1944).

■ Since the rule of *Commissioners* yields the same outcome as the avulsive theory, the same result would apply as to the title of the newly submerged lands, namely, that it remains in the former owner and does not pass to the state. The government will hold the paramount navigational servitude, but will not become the owner of the submerged lands.

3. Conclusions

There are several conclusions we distill from *Bonelli* and other cases dealing with navigable waterways. First and most important is that the state's right in the bed of the river is a limited right and relates to

a navigational or related purpose. Lands granted to the state of Oregon upon its admission in 1859 which were under water and are still under water belong to the state of Oregon at this time. While the grant of the bed in 1859 is not absolutely necessary for the paramount public purpose of control of navigation, it was, perhaps, the way the Congress felt the question of title to riverbeds should be determined. It can also be determined from *Bonelli* that where a bed of a river shifts by a slow process of erosion or accretion, title of the state to the bed of the river follows the change. However, where there is an avulsive change or a change that, under *Commissioners,* is treated like an avulsive change, the state does not obtain title to land under the water as it presently flows. The state's interest in navigation and other related purposes does not extend to a need for ownership of the riverbed.

Adequate evidence was introduced to support either the theory of avulsion as found by the trial court or a situation similar to that in *Commissioners.* But under either theory, the outcome is the same—the ownership of the land under the river does not change. The ownership of the overflowed lands in Parcels 2A, 2B and 2C remains with the owner of those lands before the changes of 1909, subject only to the paramount navigational servitude held by the state. This portion of the judgment of the trial court is affirmed.

B. Parcel No. 1

Parcel No. 1 lies between the present lines of ordinary low water with its upstream limits delineated by a line at right angles to the river and opposite the City of Corvallis Water Treatment Plant, and its downstream limits coinciding with the upstream limits of

Parcel 2A. The trial court ruled that Parcel 1 belonged to the state. There are three separate issues involved in the ownership question of Parcel No. 1: (1) the length of the Fischer Cut; (2) the ownership of an area denominated the Avery Bar; and (3) the effect of the U.S. Army Corps of Engineers' wingdike. These will be treated separately.

1. Length of the Fischer Cut

The defendant contends that the change of 1909, which it terms an avulsion, extended a distance of 3200 feet upstream from the downstream ends of Parcels 2A, 2B and 2C, and, therefore, included a portion of Parcel 1. The trial court ruled that the Fischer Cut did not extend upstream above Parcels 2A, 2B and 2C. However, the court did find that a small portion of Parcel 3 was included within the limits of Parcels 2A, 2B and 2C. This makes the cut area approximately 1600 feet in length. There is ample evidence both in the maps and in testimony of the state's expert witness to support this finding. The cut did not extend into Parcel 1.

2. The Avery Bar Issue

The Avery Bar area extends from Parcel 5 through Parcel 1. The defendant contends that when the Avery Bar was removed for gravel purposes by the railroad in the early twentieth century, the river moved back in over the excavated land. It argues that Avery Bar arose as an accretion from Parcels 5 and 6 which the defendant also contends it owns and, as such, when it was covered by water, it still belonged to the defendant. The trial court made the following finding of fact:

"* * * * *

"3. Prior to 1913, a large portion of Parcel 1 consisted of a formation known as Avery Bar.

"4. That portion of the bed of the Willamette River occupied by Avery Bar was not a part of Fischer Cut, discussed under Parcels 2A, 2B and 2C.

"5. Prior to 1913, Avery Bar originated as an island on the bed of the river below the lines of ordinary low water.

"6. Subsequently and by accretion, prior to 1913, the island joined the uplands on the left bank at the ordinary low water mark in front of government lots 9 and 10 [Parcel 5].

"7. Thereafter, a point bar developed on top of the joinder.

"8. Thereafter, the railroad in 1913 removed most of the bar by dredging large quantities of rock and gravel.

"9. The state owned from ordinary high water mark to ordinary low water mark in front of government lots 9 and 10 [ownership of these lots discussed infra at 546-49].

"10. The point bar, known as Avery Bar, accreted to land owned by the state, that is, to the island which had originated in the bed of the river below ordinary low water.

"11. Therefore, it is not material whether the accreted mass became covered with water from whatsoever cause, be it the wingdike constructed by the Corps of Engineers in 1948, discussed under Parcel 4, or the dredging of Avery Bar by the railroad in 1913-1914."

It is established that if an island or dry land forms upon that part of the bed of a river which is owned in fee by the riparian proprietor, the same is a property of said riparian proprietor. *St. Louis v. Rutz,* supra, 138 US at 245. Further, the owner of an island is entitled to land added thereto by accretion. 65 CJS 261, Navigable Waters § 82 (6).

Once again the facts settle into separate positions taken by the parties' expert witnesses. The state's witness claimed that the Avery Bar started as an island and that the deposits accreted to the island. The defendant's witness, on the other hand, contended that Avery Bar was an accretion to the uplands, namely Parcels 5 and 6, which the defendant claims it owns. There is evidence to support the trial court's finding and it is affirmed.

### 3. 1948 Corps of Engineers' Wingdike Formation

Much of this argument overlaps the Avery Bar argument, supra. The defendant contends that a wingdike constructed by the Corps of Engineers in 1948 further covered part of Parcel 1 made up of the Avery Bar area. It again argues that Avery Bar was an accretion to the uplands which the defendant owned and that the avulsive change caused by the wingdike allowed ownership of the land of Avery Bar to continue in defendant. The trial court's finding of fact in the matter is set out in full, supra. There is evidence to support these findings.

### C. Parcel 3

Parcel 3 lies in the bed of the river between ordinary low watermarks and runs from the upstream end of Parcel 2A past the confluence with the East River to a point approximately equal to the confluence with Mary's River. On July 1, 1963, the state leased to the defendant for a term of ten years that portion of Parcel 3 beginning at the confluence with the East River and extending downstream for approximately 4,000 feet. The trial court split Parcel 3, awarding the downstream portion from the confluence with the East River to the state, and the upstream portion from the con-

fluence of the East River to the defendant, finding that it was within the Fischer Cut. The state appeals from that portion of the decree awarding the area upstream of the East River to defendant. There is evidence supporting a finding that the portion upstream from the confluence of the East River was included within the Fischer Cut. Under *Bonelli* and related cases, title to that land remained in the original owner.

D.   Parcel 4

On appeal, defendant has abandoned all claim to this parcel so it need not be discussed herein.

E.   Parcel 5

Parcel 5 lies in the bed of the river between the lines of ordinary high and ordinary low along the left bank of the river. The trial court awarded this parcel to the state below the ordinary high watermark. The defendant argues:

1.   That the northerly one-third of Parcel 5 is included in the avulsive change of Fischer Cut;

2.   That a portion of Parcel 5 is included in the Avery Bar area; and

3.   That the Corps wingdike of 1948 was an artificial change of channel which worked no change of title, and was an artificial avulsion.

The trial court made the following findings of fact:

"1.   Parcel 5 lies in the bed of the river between the lines of ordinary high and ordinary low along the left bank of the river.

"2.   Inasmuch as Parcel 5 fronts government lots 9 and 10, defendant's predecessors in title acquired no right therein under laws of 1874, page 76."

The question of the length of the Fischer Cut and

the formation of the Avery Bar has already been discussed above. There is evidence to support the trial court's ruling that Parcel 5 was not within the avulsive change and that the Avery Bar did not form as an accretion to Parcel 5.

There are still several portions of Parcel 5, however, that do not fall in either the Fischer Cut or Avery Bar category. The question to be resolved as to these areas involves a United States patent to certain lands and Acts of the Oregon legislature in 1874 and 1878. In 1874, the legislature granted the area on the Willamette River between low and high water to adjacent riparian owners. General Laws of Oregon 1874, p 76.

In 1875, defendant's predecessor in interest, one Norring, filed for a homestead on Government Lots 9, 10 and 12; Parcel 5 is the area between high and low water fronting Lots 9 and 10. On October 18, 1878, the Governor signed a law repealing the statutory grant of land between high and low water on the Willamette River. General Laws of Oregon 1878, § 34, p 54. The patent to Government Lots 9 and 10 was not issued to Norring by the United States government until April of 1882. The question thus presented is whether Norring was an "owner" within the contemplation of the Oregon statute when he settled on the property in 1875 and, if not, did the patent obtained in 1882 relate back to his original entry in 1875 rendering him an owner within the contemplation of the statute.

■ In support of his contention that Norring was an "owner," defendant relies upon *Faull v. Cooke,* 19 Or 455, 26 P 662, 20 Am St R 836 (1890), in which the court determined what rights a homesteader acquired in land by virtue of his homestead settlement and sub-

sequent compliance with the Act of Congress granting homesteads to actual settlers upon the public lands of the United States and the issuance to him of a patent therefor by the United States. In *Faull* the court found that a homestead patent related back to the date of settlement. However, the question here concerns not homestead rights but the granting of the state lands between high and low water to the owner of riparian lands bordering thereon. *State v. McVey*, 168 Or 337, 121 P2d 461, 123 P2d 181 (1942), speaks more nearly to the point. In *McVey* the court considered the question of ownership of a gravel bar between high and low water. The court first noted that General Laws of Oregon 1874, p 76, did not vest title in the bed between high and low water in the federal government. The court then construed the statute and tried to determine the intent of the legislature and the historical background of the legislation. The court first noted in *McVey*, 168 Or at 353-54:

"\* \* \* It was undoubtedly due to the fact that many riparian owners along the Willamette, Coos, Coquille and Umpqua rivers had treated the river beds between high and low water marks as private property and had sometimes improved such parts of the river beds by the erection of expensive structures, that the legislature amended the 1872 enactment so as to protect them and their investments by making a grant of the beds of those rivers above low water mark to the riparian owners \* \* \*.

"The legislature was concerned with private ownership of property abutting upon tide lands and property adjacent to the beds of certain designated navigable rivers. It was not concerned with the United States as owner of any such lands. \* \* \* It may be noted \* \* \* that the act did not grant to a settler the right to purchase the tide land until *after*

he had received a patent from the federal government." (Emphasis supplied.)

Norring did not become an "owner" until after he had received the patent from the federal government. Since he did not receive the patent until after the date of the repeal of the Act authorizing him to obtain ownership of the land between high and low watermarks, he was not an "owner" within the terms of the statute.

The defendant's second argument is that the patent received by Norring in 1882 related back to his entry on March 15, 1875, when the statute granting ownership to the low water level was in effect. Defendant again cites numerous cases involving homestead law in which the patent does relate back to the date of entry insofar as it cuts off a title of one who enters after the original entryman. As made clear in *State v. McVey,* supra, the disposition of these lands is controlled by state law, and the doctrine of relation back will not apply.

Defendant makes reference to ORS 105.070 in support of his relation back claim. That statute declares that in an action at law for the recovery of the possession of real property, if either party claims the property as a donee of the United States under the Donation Law, such party from the date of his settlement on the property is deemed to have a legal estate and fee in the property. This statute originated in 1862 in General Laws of Oregon, § 329, p 230 (Deady 1845-1864), well before the statutes in question here and the decision in *State v. McVey,* supra. Also, this refers to lands owned by the United States government and passed under the homestead acts. It does not control

the later state legislative enactments dealing with the state's land between high and low water.

F. Parcel 6

Parcel 6 also lies in the left bank of the river and consists of land between ordinary high and ordinary low water. Defendant contends that Parcel 6 is in actuality Government Lot 11 of Section 12 which was patented by the defendant's predecessor in title before the repeal of the 1874 statute. The state admits that the patent on Government Lot 11 was completed prior to the repeal of the laws of 1874, but contends that Government Lot 11 has eroded away completely and that Parcel 6 arose from an island in the river that joined by accretion to the uplands.

█ The trial court made the following findings of fact:

"1. Parcel 6 lies in the bed of the river between the lines of ordinary high and ordinary low water along the left bank of the river.

"2. Parcel 6 is not within the avulsive channel of Fischer Cut.

"3. Defendant's predecessor in title acquired no right therein by virtue of Laws of 1874, p. 76.

" '4. Parcel 6 formed in the bed of the river after 1878 and accreted to the uplands at the low water mark on the frontage of government lots 10, 11 and 12 of Section 12. The accreted formation cut off the submersible lands fronting what remained of Government Lot 11.' "

Both parties agree that defendant's predecessor in title acquired rights in Government Lot 11 and the submersible lands fronting it, so paragraph 3 of the findings of fact is incorrect. However, there was adequate evidence introduced to support the finding that

Government Lot 11 eroded away and that Parcel 6 formed in the bed of the river and accreted to the uplands. So long as this parcel remains submersible, title will remain in the state. *See, Bonelli Cattle Co. v. Arizona,* supra.[⊚]

### G. Parcel 7

Parcel 7 is in an area between ordinary high and ordinary low water on the left side of the river. It consists of part of Government Lot 13, Section 12, and the Alexander Donation Land Claim. The defendant contends on appeal only that Parcel 7 was within the alleged avulsive change of 1909 occurring in the Fischer Cut area and, therefore, should belong to the defendant. The trial court found that it was not within the cut. There is evidence to support this finding.

### III. Procedural Questions Relating to Damages

■ The defendant raises several assignments of error relating to the damages awarded by the court

---

[⊚] The court in *Bonelli* adopted the doctrine of re-emergence:

"Under the doctrine of re-emergence, when identifiable riparian land, once lost by erosion, subsequently re-emerges as a result of perceptible change in the river course, title to the surfaced land revests in its former owner * * *. The re-emergence doctrine has been accepted by a number of States * * *. Because of the limited interest of the State in the former riverbed, we have held the doctrine of avulsion inapplicable to this suit between the State and a private riparian owner, who is seeking title to surfaced land *identifiable as part of his original parcel.* In that sense, we have embraced the re-emergence concept." (Emphasis supplied.) 414 US at 330, n 28.

In the case at bar, no evidence was introduced to show that any portion of Government Lot 11 was above ordinary high water. To the extent that a portion of Lot 11 is now emerged or re-emerges in the future, title to that portion could return to the defendant. For possible limitations on this return of title, see, Annotation, 41 ALR 395 (1926). On the facts as presented, we need not settle that question now.

for those parcels given to the state. The defendant first contends that the state's failure to use an *ad damnum* clause in its pleading required the trial court to exclude all evidence on damages. This contention was decided adversely to defendant's position by *Hollopeter v. Palm,* 134 Or 546, 550, 291 P 380, 294 P 1056 (1930), *appeal dismissed* 284 US 572 (1931), wherein the court concluded that the entire omission of the *ad damnum* clause was immaterial where, as here, after a cause of action is set out there is a prayer for a specified amount.

■ Defendant also argues that the court erred in denying its motion to exclude evidence from the case on damages which occurred after the filing of the complaint in the original case in June of 1965. Damages in ejectment proceedings are provided for by ORS 105.030, which statute specifically permits the recovery of damages from the date of the commencement of the action to the giving of a verdict.

The defendant next contends that the court erred in denying its motion to exclude evidence relating to quantities of gravel dredged from the river. Defendant claims that since the state has pleaded as the measure of damages the reasonable value of the use of the premises for each year or, as admitted by defendant, rental value, it cannot introduce proof as to amount of gravel removed since that does not relate to rent. However, it is noted in Newell on Ejectment, ch XIX, § 3, 606-07 (1892):

> "*Whatever* would be rent, as between landlord and tenant, is mesne profits as between the parties in ejectment. But these profits frequently include matters which would hardly be termed rent as between landlord and tenant * * *." (Emphasis supplied.)

*Accord, Crane v. Oregon R. & N. Co.,* 66 Or 317, 328, 133 P 810 (1913). Mesne profits are defined as the rents and profits or the value of the use and occupation of the real property recovered in an action of ejectment for the period during which the property has been wrongfully withheld. Newell, supra, § 2.

There are numerous cases which find that royalty payments pursuant to a lease would constitute mesne profits or rent in an ejectment action. *See, United States Steel Corporation v. United States,* 270 F Supp 253, 259 (SD NY 1967), *aff'd* 445 F2d 520 (2d Cir 1971), *cert denied* 405 US 917 (1972) ; *Moragne v. Doe, ex dem. Moragne et al.,* 143 Ala 459, 39 So 161, 111 Am St R 52 (1904) ; *Barnard v. Jamison,* 78 Cal App2d 136, 177 P2d 341 (1947).

Finally, under ORS 274.530, when the state leases its submersible and submerged lands in navigable streams, the lease is not payable in a lump sum but only on the basis of a price per cubic yard or ton for the material removed. Under the statute, "rent" would be the same as "royalties" and these would be determined on the basis of the total amount of material removed from the river.

■ In sum, where, as conceded by defendant, the state pleaded lost rent as its damages in an ejectment action, it would be able to show the value of that lost rent through the use of royalties based upon the total amount of material removed from the river.

## IV. Amount of Damages

Defendant contends that the court erred in allowing any damages to the state because such damages were speculative and also that the court erred in awarding any damages to the state for the removal of

sand and gravel from Parcel 3 as there was no substantial evidence to support the same. The trial court made the following determinations in regard to damages:

"1. Plaintiff is entitled to recover damages for the period of six years immediately preceeding [sic] the filing of the original complaint herein until date, namely, from June 7, 1959, to date.

"2. Defendant is not entitled to an offset for 'avoidable consequences' or for failure to mitigate damages.

"3. Plaintiff is entitled to damages at 12.5 cents per cubic yard of materials removed, which the Court finds would have been a reasonable sum to be paid as royalty during the entire period of wrongful withholding.

"4. Plaintiff is entitled to damages upon the total amount of minerals taken within the low-high water boundaries as established by this Court.

"5. With respect to materials that were removed, the Court finds as follows:

"(a) 574,000 cubic yards of minerals were removed from Parcel 1.

"(b) 56,000 cubic yards of minerals were removed from Parcel 3. The materials so removed were not subject to the lease between the parties and were in addition to the materials removed by the defendant from Parcel 3, which were subject to the terms of the lease between the defendant and the plaintiff.

"(c) No material was removed from Parcel 4.

"(d) 9,000 cubic yards of minerals were removed from Parcel 5.

"(e) 21,000 cubic yards of minerals were removed from Parcel 6.

"(f) No minerals were removed from Parcel 7.

"(g) The total amount of minerals removed from plaintiff's property was 660,000 cubic yards.

"B.  Conclusions of Law

"1.  Plaintiff is entitled to recover damages in the amount of $82,500 from the defendant.

"2.  The damages are unliquidated and plaintiff is entitled to interest only from the date of Judgment."

The state's witness testified that the royalties for the material removed ranged from 10 cents per cubic yard to 15 cents per cubic yard in the period of time during which the material was removed. There is thus evidence to support the cubic yard royalty figure established by the court. To establish the amount of damages, the state first introduced evidence dealing with the amount of gravel removed by three independent contractors. Records of the amounts dredged by the Joe Bernert Towing Company were furnished by the defendant to the state's fiscal auditor at the Division of State Lands. These records indicated the number of cubic yards removed during each year of the period 1963-1968 (with the exception of 1966 wherein no material was removed by this independent contractor). Evidence was also introduced dealing with the amount removed by the Willamette Tug and Barge Company based on the number of buckets removed during a given period in 1960 and the average number of cubic yards removed per bucket. Finally, Mr. Alfred Millar testified that he had dredged approximately 40,000 cubic yards from the river. Proof as to location of material taken by the independent dredge operators was based on aerial photographs marked by the witnesses as to locations of removal, and estimates of

quantities removed between low watermarks in each parcel and between high water and low watermarks.

Proof was also introduced of the amounts of gravel taken by defendant with its own equipment and personnel. The defendant furnished the state its ledger records which had been prepared on a monthly basis for the period July 1, 1959, to December 31, 1970. Raw production totals of materials were shown from the year 1959 through 1970. The state then estimated that at least 50 percent of the amount of the raw materials production came from the riverbed. Adequate evidence was introduced to support this 50 percent figure.

Combining the figures introduced, the following totals were obtained: Parcel 1: 757,588.3 cubic yards (the trial court found 574,000 cubic yards had been removed); Parcels 2A, 2B and 2C: 104,964.9 cubic yards (the trial court awarded these parcels to the defendant); Parcel 3: 120,468.6 cubic yards (the trial court found that 56,000 cubic yards had been taken out prior to July of 1963); Parcel 5: 11,506.4 cubic yards (the trial court found 9,000 cubic yards had been removed); Parcel 6: 26,427.1 cubic yards (the trial court found that 21,000 cubic yards had been removed).

There is evidence to support the trial court's finding in regard to Parcels 1, 5 and 6.

■ There is a substantial question raised with regard to Parcel 3. While the evidence introduced by the state showed that over 120,000 cubic yards had been removed, the state makes no claim for these amounts since they relate to material taken subsequent to July 1, 1963, and thus were covered by the lease between the parties. The state, however, argues that the trial court's award of 56,000 cubic yards should be affirmed on the

basis that if the court chose to disbelieve defendant's testimony that it had not dredged in the area of Parcel 3 prior to July 1, 1963, the court was certainly at liberty to do so. There is no evidence in the record to support the assertion that any materials were taken from Parcel 3 prior to July 1, 1963, the effective date of the lease, let alone the 56,000 cubic-yard total found by the trial court. The fact that defendant admitted operating in certain portions of the river does not form an adequate basis for the conclusion that it removed the amount found by the trial court prior to July of 1963. This portion of the judgment must be reversed.

## V. Interest on Damages

The trial court awarded the state $82,500 in damages for the reasonable value of the use of plaintiff's premises by defendant for the period June 7, 1959, to May 19, 1972. Interest was awarded only from the date of judgment because the damages were "unliquidated." The state contends that it was entitled as of right to interest as part of its damages.[7]

██ The majority of jurisdictions allow interest as part of the damages for the detention of land in ejectment and other actions to gain possession of the land, such interest to run from the date of taking. Annotation, 36 ALR2d 337, 354 (1954). However, the Oregon courts have specifically stated in *Meyer v. Harvey Aluminum*, 263 Or 487, 501 P2d 795 (1972), that interest

---

[7] Interest is provided by ORS 82.010:
"(1) The legal rate of interest is six per cent per annum and is payable on:
"* * * * *
"(b) Judgments and decrees for the payment of money from the date of the entry thereof unless some other date is specified therein * * *."

is not allowable on unliquidated damages. Damages are unliquidated

> "* * * where they are an uncertain quantity, depending on no fixed standard, referred to the wide discretion of a jury, and can never be made certain except by accord or verdict." 25 CJS 615, 626, Damages § 2.

While it is not always easy to categorize damages as "liquidated" or "unliquidated," we hold that in the case at bar the damages fall into the "unliquidated" category. In *Rose City Transit v. City of Portland,* 18 Or App 369, 525 P2d 1325 (1974), we allowed interest from the date of the taking of the property in question. However, in *Rose City,* unlike in the case at bar, the amount and nature of the property taken, the time of taking and the ownership prior to the taking were not at issue. Here, there was active litigation on the amount and location of gravel removed and the ownership of the bed from which the gravel was removed, as well as the value of the gravel removed. In light of all these factors which had to be determined by the finder of fact, it cannot be said that these damages were a sum to be paid in lieu of performance of the contract. *See, Medak v. Hekimian,* 241 Or 38, 404 P2d 203 (1965). This portion of the trial court's order is affirmed.

## VI. Deposition of the State's Expert

On September 20, 1971, defendant filed a motion seeking an order directing that defendant be able to take the deposition of Ronald McReary, the state's expert witness. Defendant further requested that the expert answer all questions put to him relative to the issues of the case and particularly his opinions as to the grounds on which the state claimed ownership of

each of the parcels of real property described in the complaint. Further, defendant sought to have the expert produce for examination all physical material, reports, photographs, and other physical evidence from which he obtained such facts forming the basis of his opinion. Argument on the motion was heard on September 24, 1971. However, defendant has not designated the transcript of said arguments as part of the record before this court. The trial court denied defendant's motion to depose the expert, but did allow it to have access to relevant supporting data and information upon which the expert based his opinion.

Depositions of expert witnesses are allowed by ORS 45.151. However, the right to take a deposition may be limited:

"After notice is served for taking a deposition upon motion seasonably made by any party * * * and upon notice and for good cause shown, the court in which the action, suit or proceeding is pending may make an order that the deposition shall not be taken * * * or that certain matters shall not be inquired into, or that the scope of the examination shall be limited to certain matters * * *." ORS 45.181.

■ It is clear that the federal rules of civil procedure relating to discovery and depositions served as a model for the Oregon rules. *Richardson-Merrell, Inc. v. Main,* 240 Or 533, 402 P2d 746 (1965). Under the federal rules, and, thus, by implication the Oregon rules, the granting or denial of a protective order is within the discretion of the trial court. *See,* 8 Wright and Miller, Federal Practice & Procedure 267, § 2036 (1970). And, since it is discretionary, only an abuse of that discretion would be cause for reversal. *General Dynamics Corp. v. Selb Manufacturing Co.,* 481 F2d

1204 (8th Cir 1973). In the absence of a transcript of the oral argument or a showing of a basis of the court's ruling, there is no way this court can say that the trial court abused its discretion and that "good cause" has not been shown.

## VII. Splitting of Area into 11 Parcels

In its original complaint, the state described the disputed property as one tract. In its first amended complaint the state split the disputed property into 11 separate parcels and alleged a separate cause of action as to each parcel. The defendant moved to strike the first amended complaint, demurred to it and set up as affirmative defenses both in bar and abatement of the state's alleged arbitrary splitting of a single cause of action.

■■ The "splitting of a cause of action" consists in the commencement of an action for only a part of a cause of action. *Wood et ux v. Baker et ux,* 217 Or 279, 284, 341 P2d 134 (1959). And, as a general rule, an entire cause of action cannot be divided to be made the subject of two or more actions. 1 Bancroft, Code Practice and Remedies 586, § 384 (1927). One reason for the general prohibition against the splitting of a cause of action is stated in 1 Bancroft, supra at 586-87:

> "* * * If the rule were otherwise, one could split his demand into innumerable parts, thereby multiplying litigation and adding indefinitely to the costs. Moreover, the law does not favor a multiplicity of suits, and requires that all the matters in controversy between parties which may fairly be included in one action be so included."

*Accord, Wood et ux v. Baker et ux,* supra. Likewise, in *Coos Bay Oyster Coop. v. Highway Com.,* 219 Or

588, 348 P2d 39 (1959), cited by defendant, the court notes that:

> "* * * Allowance of separate actions for fractional claims would inevitably result in the pyramiding, duplicating and overlapping of damage items to the detriment of the condemnor * * *." 219 Or at 594.

■ Defendant contends that the state's splitting of its case into 11 separate claims made the case unduly complicated, and was done solely for the convenience of the state's expert witness. Applying the policy reasons for avoiding the splitting of a cause of action to the facts of this case, it becomes clear that none of the hazards sought to be protected against were present here. First, all of these causes of action were presented in a single complaint, so there was no danger of the defendant's being harassed by a multiplicity of suits. At the conclusion of the lawsuit, the limits of the property in question, its ownership, and damages, would be determined. As the court noted in *Wood et ux v. Baker et ux,* supra at 285, where there is no question of a multiplicity of suits there is no violation of the rule against splitting a cause of action. Second, splitting of the one parcel into 11 separate parcels reflects more nearly the various geographical differences and historical origins of the parcels involved. Rather than harassing the defendant, such splitting would make it easier for the factual differences between the parties to be settled.

■ While *Coos Bay Oyster Coop. v. Highway Com.,* supra, cited by defendant, does support the proposition that interests in land cannot be split into fractional claims, that case involved the attempt to split one interest in real property into several subinterests;

this was not the result here. Also, *Coos Bay* must be evaluated in light of the policy determinants behind the prohibition of a splitting of the cause of action. Viewed in this light, we do not find the splitting of the land in question into 11 separate parcels, each the subject of a cause of action, to be improper.

VIII. Prescriptive Rights

The defendant alleges that the company had, continuously since 1920, conducted sand and gravel removal operations from the disputed portions of the Willamette River, which removal had been open, continuous, notorious, hostile, exclusive and adverse to the state, and had been known to the state since 1933. The defendant contends that this removal results in the defendant's acquiring an irrevocable property right to remove sand and gravel from the disputed property. The defendant contends that this property right is one of prescription.

There is some authority that a state may lose rights to property through prescription. As noted in 1 Farnham, Waters and Water Rights 225, § 45b:

> "Where the land under tide water may be granted by the state, no reason exists why a private individual cannot establish title under the theory of lost grant. * * * [R]ecords may become lost, and it is unreasonable to require the original grant to be produced in all cases. Therefore the presumption of grant may be raised by long possession accompanied by acts of ownership * * *."

However, it is important to note that this prescriptive right is limited:

> "* * * If the law prohibits the grant of the tide land, no title can be acquired by adverse possession, since no grant can be presumed * * *." 1 Farnham, supra at 226.

562

■ Between 1878 and 1963, there was no statutory provision by which the state could grant title to any nontidal portion of the Willamette River. *See, State v. McVey,* supra; *Corvallis Sand & Gravel v. Land Board,* supra. The authority of the state to grant title to submerged and submersible lands in the Willamette River in the Corvallis area arose after 1963. Since the state has been actively contesting defendant's possession of these parcels since 1958, it is impossible for defendant to contend that there has been a "lost grant" prior to 1963. No prescriptive rights arose against the state.

IX.

■ Defendant raises several assignments of error which need only brief mention. First, it contends that ejectment will not lie to recover the possession of land under water. This question has, by implication, been decided adversely to defendant's claim in *Corvallis Sand & Gravel v. Land Board,* supra. *See also, Lowndes v. Huntington,* 153 US 1, 14 S Ct 758, 38 L Ed 615 (1894); *Bates v. Illinois Central Railroad Company,* 66 US (1 Black) 204, 17 L Ed 158 (1861).

■ Defendant's argument that estoppel and acquiescence in the trespass should apply against the state in this case was also decided adversely to defendant's position in *Corvallis Sand & Gravel v. Land Board,* supra, 250 Or at 328-29. The same policy considerations that militated against the allowance of the defense of laches in that case apply alike to the defense of estoppel and acquiescence.

■ Defendant's argument that the statute of limitations applies is without support. ORS 12.250.[9]

---

[9]

"Unless otherwise made applicable thereto, the limitations prescribed in this chapter shall not apply to actions brought

■ Finally, defendent raises certain constitutional challenges to both the ejectment Statutes, ORS 105.005, et seq, and the ejectment proceeding as a whole. Both of these points could have been raised in the earlier challenge to the proceeding in *Corvallis Sand & Gravel v. Land Board,* supra, but were not. Even assuming that these arguments are meritorious, defendant is foreclosed from raising them now.

In sum, we affirm the judgment of the trial court in all respects with the exception of the award of damages for Parcel 3, which award we reverse.

Affirmed in part; reversed in part.

---

in the name of the state, or any county, or other public corporation therein, or for its benefit." ORS 12.250.