# OREGON ex rel. STATE LAND BOARD v. CORVALLIS SAND & GRAVEL CO.

No. 75–567.   Argued October 4, 1976—Decided January 12, 1977*

*Together with No. 75–577, *Corvallis Sand & Gravel Co.* v. *Oregon ex rel. State Land Board,* also on certiorari to the same court.

*Peter S. Herman* argued the cause for petitioner in No. 75–567 and for respondent in No. 75–577. With him on the briefs were *Lee Johnson,* Attorney General of Oregon, and *W. Michael Gillette,* Solicitor General.

*Robert Mix* argued the cause and filed briefs for respondent in No. 75–567 and for petitioner in No. 75–577.

*Russell Iungerich,* Deputy Attorney General of California, argued the cause for the State of California et al. as *amici curiae* in both cases. With him on the brief were *Evelle J. Younger,* Attorney General, *Sanford N. Gruskin,* Chief Assistant Attorney General, *N. Gregory Taylor,* Assistant Attorney General, and *Jerold A. Krieger,* Deputy Attorney General, joined by the Attorneys General for their respective States as follows: *William J. Baxley* of Alabama, *Avrum Gross* of Alaska, *Robert L. Shevin* of Florida, *Arthur K. Bolton* of Georgia, *Ronald Amemiya* of Hawaii, *Wayne L. Kidwell* of Idaho, *Theodore L. Sendak* of Indiana, *Richard C. Turner* of Iowa, *William J. Guste, Jr.,* of Louisiana, *Francis B. Burch* of Maryland, *Warren R. Spannaus* of Minnesota, *A. F. Summer*

of Mississippi, *Robert L. Woodahl* of Montana, *Paul L. Douglas* of Nebraska, *Robert List* of Nevada, *William F. Hyland* of New Jersey, *Allen I. Olsen* of North Dakota, *Daniel R. McLeod* of South Carolina, *William Janklow* of South Dakota, *John L. Hill* of Texas, *Andrew P. Miller* of Virginia, and *Chauncey H. Browning, Jr.,* of West Virginia.†

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

This lawsuit began when the State of Oregon sued Corvallis Sand & Gravel Co., an Oregon corporation, to settle the ownership of certain lands underlying the Willamette River. The Willamette is a navigable river, and this land is located near Corvallis, Oregon. The river is not an interstate boundary.

Corvallis Sand had been digging in the disputed part of the riverbed for 40 to 50 years without a lease from the State. The State brought an ejectment action against Corvallis Sand, seeking to recover 11 separate parcels of riverbed, as well as damages for the use of the parcels. The State's complaint alleged that by virtue of its sovereignty it was the owner in fee simple of the disputed portions of the riverbed, and that it was entitled to immediate possession and damages. Corvallis Sand denied the State's ownership of the bed.

---

†*Slade Gorton,* Attorney General, and *Joseph Lawrence Coniff, Jr.,* Assistant Attorney General, filed briefs in both cases for the State of Washington as *amicus curiae* urging reversal.

Briefs of *amici curiae* were filed in both cases by *Vernon B. Romney,* Attorney General of Utah, *Robert B. Hansen,* Deputy Attorney General, *Dallin W. Jensen,* Assistant Attorney General, *Richard L. Dewsnup,* Special Assistant Attorney General, *Toney Anaya,* Attorney General of New Mexico, and *Paul L. Bloom,* Assistant Attorney General, for the States of Utah et al.; and by *K. J. Gilly* and *Jack C. Caldwell* for Dow Chemical Co. et al.

Each party was partially successful in the Oregon courts,[1] and we granted cross petitions for certiorari. 423 U. S. 1048. Those courts understandably felt that our recent decision in *Bonelli Cattle Co.* v. *Arizona,* 414 U. S. 313 (1973), required that they ascertain and apply principles of federal common law to the controversy. Twenty-six States have joined in three *amicus* briefs urging that we reconsider *Bonelli, supra,* because of what they assert is its significant departure from long-established precedent in this Court.

## I

The nature of the litigation and the contentions of the parties may be briefly stated. Title to two distinct portions of land has been at issue throughout. The first of these portions has apparently been within the bed of the Willamette River since Oregon's admission into the Union.

The other portion of the land underlies the river in an area known as Fischer Cut, which was not a part of the riverbed at the time Oregon was admitted to the Union. The trial court found that prior to a flood which occurred in November 1909, the Willamette flowed around a peninsula-like formation known as Fischer Island, but that by 1890 a clearly discernible overflow channel across the neck of the peninsula had developed. Before 1909 this channel carried

---

[1] The case was brought and tried in the Circuit Court of Benton County, Ore. Both parties appealed from the judgment rendered by that court to the Oregon Court of Appeals. Subsequent to that judgment, our decision in *Bonelli Cattle Co.* v. *Arizona,* 414 U. S. 313 (1973), had come down and the Court of Appeals employed the reasoning of *Bonelli* in deciding the appeal. Both parties then sought review in the Supreme Court of Oregon, which granted discretionary review limited to the factual question of the length of a channel known as Fischer Cut, modified the Court of Appeals' decision in this respect, and, without discussion, affirmed the decision "[i]n all other respects." Because of this procedural history we shall, as a matter of convenience, refer in the course of this opinion to rulings and findings of the "Oregon courts."

the flow of the river only at its intermediate or high stages, and the main channel of the river continued to flow around Fischer Island. But in November 1909, a major flood, in the words of the Oregon trial court, "suddenly and with great force and violence converted Fischer Cut into the main channel of the river."

The trial court, sitting without a jury, awarded all parcels in dispute, except for the Fischer Cut lands, to the State. That court found that the State had acquired sovereign title to those lands upon admission into the Union, and that it had not conveyed that title. The State was also awarded damages to recompense it for Corvallis Sand's use of the lands.

With respect to the Fischer Cut lands, the trial court found that avulsion, rather than accretion, had caused the change in the channel of the river, and therefore the title to the lands remained in Corvallis Sand, the original owner of the land before it became riverbed.

The Oregon Court of Appeals affirmed. That court felt bound, under *Bonelli*, to apply federal common law to the resolution of this property dispute. In so doing, the court found that the trial court's award of Fischer Cut to Corvallis Sand was correct either under the theory of avulsion, or under the so-called exception to the accretion rule, announced in *Commissioners* v. *United States*, 270 F. 110 (CA8 1920).[2] The court, finding that preservation of the State's

---

[2] The court quoted the following language from *Commissioners* in support of that rule:

" '[The accretion rule] is applicable to and governs cases where the boundary line, the thread of the stream, by the slow and gradual processes of erosion and accretion creeps across the intervening space between its old and its new location. To this rule, however, there is a well-established and rational exception. It is that, where a river changes its main channel, not by excavating, passing over, and then filling the intervening place between its old and its new main channel, but by flowing around this intervening land, which never becomes in the meantime its main channel,

interest in navigation, fishing, and other related goals did not require that it acquire ownership of the new bed, rejected the argument that the State's sovereign title to a riverbed follows the course of the river as it moves.

## II

In this Court, Oregon urges that we either modify *Bonelli* or expound "federal common law" in such a way that its title to all the land in question will be established. Corvallis Sand urges that we interpret "federal common law" in such a manner that it will prevail. *Amici,* as previously noted, urge that we re-examine *Bonelli* because in their view that case represented a sharp break with well-established previous decisions of the Court.[3]

The dispute in *Bonelli* was over the ownership of the former bed of the Colorado River, a bed which the river had abandoned because of a federal rechanneling project. The Bonelli land was not part of the actual riverbed, however, either at the time Arizona was admitted to the Union, or at the time of suit. Before Arizona had been admitted as a

---

and the change from the old to the new main channel is wrought during many years by the gradual or occasional increase from year to year of the proportion of the waters of the river passing over the course which eventually becomes the new main channel, and the decrease from year to year of the proportion of its waters passing through the old main channel until the greater part of its waters flow through the new main channel, the boundary line between the estates remains in the old channel subject to such changes in that channel as are wrought by erosion or accretion while the water in it remains a running stream. . . .' " 18 Ore. App. 524, 539–540, 526 P. 2d 469, 477 (1974).

[3] The dissenting opinion is correct in stating that neither party in its brief requested that *Bonelli* be overruled. That question was elaborately briefed by *amici,* however, and counsel were questioned about it during oral argument. Counsel for *amici* urged that *Bonelli* be overruled. Counsel for the State agreed that a re-examination of *Bonelli* would be appropriate, and that upon such re-examination issues such as those in this case should be left to state law. Tr. of Oral Arg. 34.

State, Bonelli's predecessor in title had received a United States patent to the land. Over a period of years the Colorado River had migrated gradually eastward, eroding its east bank and depositing alluvion on its west bank in the process. In the course of this movement of the river the Bonelli land, which had at the time of patent been on the east bank, was submerged, and, until the rechanneling project, most of it was under water. After the completion of the rechanneling project the bed of the Colorado River was substantially narrowed, and the Bonelli land re-emerged.

The Supreme Court of Arizona held that Arizona owned the title to the beds of navigable rivers within its borders, and that Arizona therefore acquired title to the Bonelli land when it became part of the riverbed as a result of the eastward migration of the Colorado. That court went on to hold that under state law the re-emergence of the land was an avulsive change, which did not divest the State of its title to the exposed land. This Court granted certiorari and reversed the Supreme Court of Arizona.

We phrased the critical inquiry in *Bonelli* in these words:

> "The issue before us is not what rights the State has accorded private [land] owners in lands which the State holds as sovereign; but, rather, *how far* the State's sovereign right extends under the equal-footing doctrine and the Submerged Lands Act—whether the State retains title to the lands *formerly* beneath the stream of the Colorado River *or whether that title is defeasible by the withdrawal of those waters.*" 414 U. S., at 319–320. (Emphasis added.)

We held that federal common law should govern in deciding whether a State retained title to lands which had re-emerged from the bed of a navigable stream, relying in part on *Borax, Ltd.* v. *Los Angeles,* 296 U. S. 10 (1935). That case held that the extent and validity of a federal grant was a question to be resolved by federal law, and in *Bonelli*

we decided that the nature of the title conferred by the equal-footing doctrine set forth in *Pollard's Lessee* v. *Hagan,* 3 How. 212 (1845), should likewise be governed by federal common law. Under the equal-footing doctrine "the new States since admitted have the same rights, sovereignty and jurisdiction . . . as the original States possess within their respective borders." *Mumford* v. *Wardwell,* 6 Wall. 423, 436 (1867). *Pollard's Lessee* held that under the equal-footing doctrine new States, upon their admission to the Union, acquire title to the lands underlying navigable waters within their boundaries.

We went on to discuss the nature of the sovereign's interest in the riverbed, which we found to lie in the protection of navigation, fisheries, and similar purposes. We held that under federal common law, as we construed it in that case, Arizona's sovereign interest in the re-emerged land was not sufficient to enable it to retain title. We found the principle governing title to lands which have been formed by accretion, rather than that which governs title where there has been an avulsive change in the channel of the river, to be applicable. We chose the former because it would both ensure the riparian owner access to the water's edge and prevent the State from receiving a windfall. We therefore decided that Bonelli, as riparian owner, was entitled to the land in question.

Our analysis today leads us to conclude that our decision to apply federal common law in *Bonelli* was incorrect. We first summarize the basis for this conclusion, and then elaborate in greater detail in Parts III and IV, *infra.*

The title to the land underlying the Colorado River at the time Arizona was admitted to the Union vested in the State as of that date under the rule of *Pollard's Lessee* v. *Hagan, supra.* Although federal law may fix the initial boundary line between fast lands and the riverbeds at the time of a State's admission to the Union, the State's title

to the riverbed vests absolutely as of the time of its admission and is not subject to later defeasance by operation of any doctrine of federal common law. *Wilcox* v. *Jackson*, 13 Pet. 498 (1839); *Weber* v. *Harbor Comm'rs*, 18 Wall. 57 (1873).

*Bonelli's* thesis that the equal-footing doctrine would require the effect of a movement of the river upon title to the riverbed to be resolved under federal common law was in error. Once the equal-footing doctrine had vested title to the riverbed in Arizona as of the time of its admission to the Union, the force of that doctrine was spent; it did not operate after that date to determine what effect on titles the movement of the river might have. Our error, as we now see it, was to view the equal-footing doctrine enunciated in *Pollard's Lessee* v. *Hagan* as a basis upon which federal common law could supersede state law in the determination of land titles. Precisely the contrary is true; in *Pollard's Lessee* itself the equal-footing doctrine resulted in the State's acquisition of title notwithstanding the efforts of the Federal Government to dispose of the lands in question in another way.

The equal-footing doctrine did not, therefore, provide a basis for federal law to supersede the State's application of its own law in deciding title to the Bonelli land, and state law should have been applied unless there were present some other principle of federal law requiring state law to be displaced. The only other basis [4] for a colorable claim

---

[4] Arizona, in its brief, also relied upon the Submerged Lands Act of 1953, 43 U. S. C. § 1301. However, as discussed in *Bonelli*, the Submerged Lands Act did not alter the scope or effect of the equal-footing doctrine, nor did it alter state property law regarding riparian ownership. The effect of the Act was merely to confirm the States'·title to the beds of navigable waters within their boundaries as against any claim of the United States Government. As merely a declaration of the States' pre-existing rights in the riverbeds, nothing in the Act in any way mandates, or even indicates, that federal common law should be used to resolve

of federal right in *Bonelli* was that the Bonelli land had originally been patented to its predecessor by the United States, just as had most other land in the Western States. But that land had long been in private ownership and, hence, under the great weight of precedent from this Court, subject to the general body of state property law. *Wilcox* v. *Jackson, supra,* at 517. Since the application of federal common law is required neither by the equal-footing doctrine nor by any other claim of federal right, we now believe that title to the Bonelli land should have been governed by Arizona law, and that the disputed ownership of the lands in the bed of the Willamette River in this case should be decided solely as a matter of Oregon law.

## III

*Pollard's Lessee* v. *Hagan, supra,* holds that the State receives absolute title to the beds of navigable waterways within its boundaries upon admission to the Union, and contains not the slightest suggestion that such title is "defeasible" in the technical sense of that term. The issue there was whether a federal patent, issued after the admission of Alabama to the Union, could validly convey lands that had underlain navigable waters upon Alabama's admission. The Court had before it the following jury charge, given in the ejectment action below:

"[T]hat if [the jury] believed the premises sued for were below usual high water-mark, at the time

---

ownership of lands which, by the very terms of the Act, reside in the States. We recognized as much in *Bonelli,* see 414 U. S., at 318, and our references to the Act in *Bonelli* in no way indicate that it was the Act, rather than the scope of the equal-footing doctrine, which resulted in our application of federal common law:

"Since the Act does not extend to the States any interest beyond those afforded by the equal-footing doctrine, the State can no more base its claim to lands unnecessary to a navigational purpose on the Submerged Lands Act than on that doctrine." *Id.,* at 324–325.

> Alabama was admitted into the union, then the act of Congress, and the patent in pursuance thereof, could give the plaintiffs no title, whether the waters had receded by the labour of man only, or by alluvion . . . ." 3 How., at 220.

The Court regarded the case as one of signal importance, and it observed that the decision was approached "with a just sense of its great importance to all the states of the union, and particularly to the new ones." *Ibid.* Mr. Justice Catron, in his dissenting opinion, commented that he deemed the case "the most important controversy ever brought before this court, either as it respects the amount of property involved, or the principles on which the present judgment proceeds . . . ." *Id.,* at 235. The Court gave careful consideration to the role of the United States in holding the lands in question in trust for the new States, and to the recognition that the new States would be admitted "upon an equal footing, in all respects whatever . . ." with the original States. *Id.,* at 224. Citing *Martin* v. *Waddell,* 16 Pet. 367, 410 (1842), the Court noted that the original States held the " 'absolute right to all their navigable waters, and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution.' " 3 How., at 229. The Court then concluded:

> "First, The shores of navigable waters, and the soils under them, were not granted by the Constitution to the United States, but were reserved to the states respectively. Secondly, The new states have the same rights, sovereignty, and jurisdiction over this subject as the original states. Thirdly, The right of the United States to the public lands, and the power of Congress to make all needful rules and regulations for the sale and disposition thereof, conferred no power to grant to the plaintiffs the land in controversy . . . ." *Id.,* at 230.

In so holding, the Court established the absolute title of the States to the beds of navigable waters, a title which neither a provision in the Act admitting the State to the Union [5] nor a grant from Congress to a third party was capable of defeating.

Thus under *Pollard's Lessee* the State's title to lands underlying navigable waters within its boundaries is conferred not by Congress but by the Constitution itself. The rule laid down in *Pollard's Lessee* has been followed in an unbroken line of cases which make it clear that the title thus acquired by the State is absolute so far as any federal principle of land titles is concerned. For example, in *Weber v. Harbor Comm'rs*, 18 Wall., at 65–66, the Court reaffirmed the doctrine of *Pollard's Lessee:*

> "Upon the admission of California into the Union upon equal footing with the original States, *absolute property in, and dominion and sovereignty over, all soils under the tidewaters within her limits passed to the State, with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper,* subject only to the paramount right of navigation over the waters . . . ." (Emphasis added.)

In *Barney v. Keokuk*, 94 U. S. 324, 338 (1877), the Court extended the doctrine to waters which were nontidal but nonetheless navigable, consistent with its earlier extension of admiralty jurisdiction to such waters in *The Propeller*

---

[5] The compact entered into when Alabama was admitted to the Union contained the following language: " '[A]ll navigable waters within the said state shall for ever remain public highways, free to the citizens of said state, and of the United States, without any tax, duty, impost, or toll therefor, imposed by the said state.'. . ." 3 How., at 229. The Court found that this language merely enunciated Congress' right to regulate commerce upon the navigable waters, similarly reserved to it with respect to the original States, and thus the language did not detract from the State's absolute title in the bed. *Id.*, at 229–230.

*Genesee Chief* v. *Fitzhugh,* 12 How. 443 (1852). And in *Shively* v. *Bowlby,* 152 U. S. 1 (1894), the Court recounted *in extenso* the many cases which had followed the doctrine of *Pollard's Lessee.* In summarizing its holding, 152 U. S., at 57–58, the Court stated:

> "The new States admitted into the Union since the adoption of the Constitution have the same rights as the original States in the tide waters, and in the lands under them, within their respective jurisdictions. The title and rights of riparian or littoral proprietors in the soil below [the] high water mark, therefore, are governed by the laws of the several States, subject to the rights granted to the United States by the Constitution."

At the time of our decision in *Bonelli,* this line of authority stood side by side with, and was wholly consistent with, other cases requiring the application of federal law to questions of land titles or boundaries. Where Mexico had patented tidal lands to a private owner before ceding to the United States the territory which ultimately became the State of California, California did not succeed to the ownership of such lands upon her admission to the Union. *Knight* v. *United States Land Assn.,* 142 U. S. 161 (1891). If a navigable stream is an interstate boundary, this Court, in the exercise of its original jurisdiction over suits between States, has necessarily developed a body of federal common law to determine the effect of a change in the bed of the stream on the boundary. See, *e. g., Nebraska* v. *Iowa,* 143 U. S. 359 (1892); *Arkansas* v. *Tennessee,* 246 U. S. 158 (1918). Congress possesses by virtue of its commerce power a "navigational servitude" with respect to navigable waters.

> "All navigable waters are under the control of the United States for the purpose of regulating and improving navigation, and although the title to the shore and submerged soil is in the various States and individual

owners under them, it is always subject to the servitude in respect of navigation created in favor of the Federal government by the Constitution." *Gibson* v. *United States,* 166 U. S. 269, 271–272 (1897).

In *Borax, Ltd.* v. *Los Angeles,* 296 U. S. 10 (1935), this Court also found a basis to apply federal law, but its rationale does not dictate a different result in this case. In *Borax,* the city of Los Angeles brought suit to quiet title in certain land in Los Angeles Harbor. Los Angeles claimed the land under a grant from the State of California, whereas Borax, Ltd., claimed the land as a successor in interest to a federal patentee. The federal patent had purported to convey a specified quantity of land, 18.88 acres, according to a survey by the General Land Office. This Court recognized that if the patent purported to convey lands which were part of the tidelands, the patent would be invalid to that extent since the Federal Government has no power to convey lands which are rightfully the State's under the equal-footing doctrine. *Id.,* at 17–19. The Court affirmed the decision of the Court of Appeals to remand for a new trial to allow the city to attempt to prove that some portion of the lands described in the federal patent was in fact tideland.

The Court went on to hold that the boundary between the upland and tideland was to be determined by federal law. *Id.,* at 22. This same principle would require that determination of the initial boundary between a riverbed, which the State acquired under the equal-footing doctrine, and riparian fast lands likewise be decided as a matter of federal law rather than state law. But that determination is solely for the purpose of fixing the boundaries of the riverbed acquired by the State at the time of its admission to the Union; thereafter the role of the equal-footing doctrine is ended, and the land is subject to the laws of the State. The expressions in *Bonelli* suggesting a more ex-

pansive role for the equal-footing doctrine are contrary to the line of cases following *Pollard's Lessee.*[6]

For example, this Court has held that subsequent changes in the contour of the land, as well as subsequent transfers of the land, are governed by the state law. *Joy* v. *St. Louis*, 201 U. S. 332, 343 (1906). Indeed, the rule that lands once having passed from the Federal Government are subject to the laws of the State in which they lie antedates *Pollard's Lessee.* As long ago as 1839, the Court said:

> "We hold the true principle to be this, that whenever the question in any Court, state or federal, is, *whether* a title to land which had once been the property of the United States has passed, that question must be resolved by the laws of the United States; but that *whenever*, according to those laws, *the title shall have passed*, then that property, like all other property in the state, is *subject to state legislation;* so far as that legislation is consistent with the admission that the title passed and vested according to the laws of the United States."
> *Wilcox* v. *Jackson*, 13 Pet., at 517. (Emphasis added.)

---

[6] *Amici* Utah and New Mexico also urge us to reconsider our decision in *Hughes* v. *Washington*, 389 U. S. 290 (1967). They advance the same reasons for such reconsideration as they do with respect to *Bonelli*. But *Hughes* was not cited by the Oregon courts below, and in *Bonelli* we expressly declined to rely upon it as a basis for our decision there, see 414 U. S., at 321 n. 11. We therefore have no occasion to address the issue. We are aware of the fact that *Hughes* gave to *Borax* the same sort of expansive construction as did *Bonelli*, but we are likewise aware that *Hughes* dealt with oceanfront property, a fact which the Court thought sufficiently different from the usual situation so as to justify a "federal common law" rule of riparian proprietorship:

"The rule deals with waters that lap both the lands of the State and the boundaries of the international sea. This relationship, at this particular point of the marginal sea, is too close to the vital interest of the Nation in its own boundaries to allow it to be governed by any law but the 'supreme Law of the Land.'" 389 U. S., at 293.

The contrary approach would result in a perverse application of the equal-footing doctrine. An original State would be free to choose its own legal principles to resolve property disputes relating to land under its riverbeds; a subsequently admitted State would be *constrained* by the equal-footing doctrine *to* apply the federal common-law rule, which may result in property law determinations antithetical to the desires of that State. See *Bonelli*, 414 U. S., at 332–333 (STEWART, J., dissenting).

Thus, if the lands at issue did pass under the equal-footing doctrine, state title is not subject to defeasance and state law governs subsequent dispositions.[7]

## IV

A similar result obtains in the case of riparian lands which did not pass under the equal-footing doctrine. This Court has consistently held that state law governs issues relating to this property, like other real property, unless some other principle of federal law requires a different result.

Under our federal system, property ownership is not governed by a general federal law, but rather by the laws of the several States. "The great body of law in this country which controls acquisition, transmission, and transfer of property, and defines the rights of its owners in relation to the state or to private parties, is found in the statutes and decisions of the state." *Davies Warehouse Co.* v. *Bowles*, 321 U. S. 144, 155 (1944). This is particularly true with respect

---

[7] We are fortified in our conclusion that *Bonelli*'s equal-footing analysis was unsound by the fact that its author has likewise rejected it. The dissenting opinion of our Brother MARSHALL, *post*, p. 382, would sustain the result reached in *Bonelli* but on a ground explicitly avoided in the *Bonelli* opinion. The "mystery" or "puzzle" to which our Brother refers, *post*, at 384, turns out to be nonexistent; in rejecting *Bonelli*'s equal-footing analysis, we are simply refusing to be more Roman than the Romans. The dissent's own abandonment of *Bonelli*'s *ratio decidendi* is anything but a ringing endorsement of the rule of *stare decisis*.

to real property, for even when federal common law was in its heyday under the teachings of *Swift* v. *Tyson,* 16 Pet. 1 (1842), an exception was carved out for the local law of real property. *Id.,* at 18. See *United States* v. *Little Lake Misere Land Co.,* 412 U. S. 580, 591 (1973).

This principle applies to the banks and shores of waterways, and we have consistently so held. *Barney* v. *Keokuk,* 94 U. S. 324 (1877), involved an ejectment action by the plaintiff against the city involving certain land along the banks of the Mississippi River. After noting that the early state doctrines regarding the ownership of the soil of nontidal waters were based upon the then-discarded English view that nontidal waters were presumed nonnavigable, the Court clearly articulated the rule that the States could formulate, and modify, rules of riparian ownership as they saw fit:

> "Whether, as rules of property, it would now be safe to change these doctrines [arising out of the confusion of the original classification of nontidal waters as nonnavigable] where they have been applied, as before remarked, is for the several States themselves to determine. If they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections. In our view of the subject the correct principles were laid down in *Martin* v. *Waddell,* 16 Pet. 367, *Pollard's Lessee* v. *Hagan,* 3 How. 212, and *Goodtitle* v. *Kibbe,* 9 *id.* 471. These cases related to tide-water, it is true; but they enunciate principles which are equally applicable to all navigable waters." *Id.,* at 338.

In *Shively* v. *Bowlby,* the Court canvassed its previous decisions and emphasized that state law controls riparian ownership. The Court concluded that grants by Congress of land bordering navigable waters "leave the question of the use of the shores by the owners of uplands to the sovereign control of each State, subject only to the rights

vested by the Constitution in the United States." 152 U. S., at 58. As the Court again emphasized in *Packer* v. *Bird,* 137 U. S. 661, 669 (1891):

> "[W]hatever incidents or rights attach to the ownership of property conveyed by the government will be determined by the States, subject to the condition that their rules do not impair the efficacy of the grants or the use and enjoyment of the property by the grantee."

This doctrine was squarely applied to the case of a riparian proprietor in *Joy* v. *St. Louis,* 201 U. S. 332 (1906). The land at issue had originally been granted to the patentee's predecessor by Spain, and Congress had confirmed the grant and issued letters patent. This Court held that the fact that a plaintiff claimed accretions to land patented to his predecessor by the Federal Government did not confer federal-question jurisdiction, and implicitly rejected any notion that "federal common law" [8] had any application to the resolution. Central to this result was the holding:

> "As this land in controversy is not the land described

---

[8] We think that the insistence of our dissenting Brethren that "federal common law" should be applied to a determination of title in this case, albeit not for the same reason expounded in *Bonelli,* misapprehends the meaning and significance of the term "common law" as it is used in several of our old cases.

In the generic sense of the term, the "common law" has been defined as:

"'the body of those principles and rules of action, relating to the government and security of persons and property, which derive their authority solely from usages and customs of immemorial antiquity, or from the judgments and decrees of the courts recognizing, affirming and enforcing such usages and customs; and, in this sense, particularly the ancient unwritten law of England.'" *Western Union Telegraph Co.* v. *Call Pub. Co.,* 181 U. S. 92, 102 (1901) (citing Black's Law Dictionary).

It is in this descriptive sense that the term is used in the two principal quotations relied upon in the dissenting opinion, *New Orleans* v. *United States,* 10 Pet. 662, 717 (1836), and *County of St. Clair* v. *Lovingston,* 23 Wall. 46, 68 (1874). In the passage from *New Orleans,* the Court

in the letters patent or the [A]cts of Congress, but, as is stated in the petition, is formed by accretions or gradual deposits from the river, whether such land belongs to the plaintiff is, under the cases just cited, a matter of local or state law, and not one arising under the laws of the United States." *Id.*, at 343.

## V

Upon full reconsideration of our decision in *Bonelli*, we conclude that it was wrong in treating the equal-footing doctrine as a source of federal common law after that doctrine had vested title to the riverbed in the State of Arizona as of the time of its admission to the Union. We also think there was no other basis in that case, nor is there any in this case, to support the application of federal common law to override state real property law. There are obviously institutional considerations which we must face in deciding whether for that reason to overrule *Bonelli* or to adhere to it, and those considerations cut both ways. Substantive rules governing the law of real property are peculiarly subject to the principle of *stare decisis*. See *United States* v. *Title Ins. Co.*, 265 U. S. 472 (1924).

Here, however, we are not dealing with substantive property law as such, but rather with an issue substantially related to the constitutional sovereignty of the States. In cases such as this, considerations of *stare decisis* play a less important role than they do in cases involving substantive property law. Cf. *The Passenger Cases*, 7 How. 283,

---

simply summarized the accepted British common-law doctrine of accretion. In *Lovingston*, the Court affirmed the judgment of the Supreme Court of Illinois which had rested upon the proper rule of common law, without any indication that this rule was not the law of Illinois. In light of the treatment of the subject in such later cases as *Barney* v. *Keokuk, Packer* v. *Bird, Shively* v. *Bowlby*, and *Joy* v. *St. Louis*, all discussed in the text, no "rule" requiring the application of "federal common law" to questions of riparian ownership may be deduced from *New Orleans* and *Lovingston*. See *post*, at 387–388.

470 (1849) (Taney, C. J., dissenting); *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 405–411 (1932) (Brandeis, J., dissenting); *Smith* v. *Allwright,* 321 U. S. 649 (1944). Even if we were to focus on the effect of our decision upon rules of substantive property law, our concern for unsettling titles would lead us to overrule *Bonelli,* rather than to retain it. See *Minnesota Co.* v. *National Co.,* 3 Wall. 332, 334 (1866). Since one system of resolution of property disputes has been adhered to from 1845 until 1973, and the other only for the past three years, a return to the former would more closely conform to the expectations of property owners than would adherence to the latter. We are also persuaded that, in large part because of the positions taken in the briefs presented to the Court in *Bonelli,* the *Bonelli* decision was not a deliberate repudiation of all the cases which had gone before. We there proceeded on the view, which we now think to have been mistaken, that *Borax, supra,* should be read so expansively as to in effect overrule *sub silentio* the line of cases following *Pollard's Lessee.*

For all of these reasons, we have now decided that *Bonelli's* application of federal common law to cases such as this must be overruled.

The judgment under review is vacated, and the case remanded to the Supreme Court of Oregon for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Mr. Justice Brennan, dissenting.

I would not overrule *Bonelli Cattle Co.* v. *Arizona,* 414 U. S. 313 (1973), and would therefore affirm the judgment of the Oregon Supreme Court.

Mr. Justice Marshall, with whom Mr. Justice White joins, dissenting.

The Court today overrules a three-year-old decision, *Bonelli Cattle Co.* v. *Arizona,* 414 U. S. 313 (1973), in which

seven of the eight participating Justices joined. In addition, as the Court is certain to announce when the occasion arises, today's holding also overrules *Hughes* v. *Washington,* 389 U. S. 290 (1967), a nine-year-old decision also joined by all but one of the participating Justices.[1] It is surprising, to say the least, to find these nearly unanimous recent decisions swept away in the name of *stare decisis.* See *ante,* at 381–382.

The public, especially holders of riparian or littoral prop-

[1] Although the Court rejects the reasoning on which *Hughes* is based, it refrains from formally overruling *Hughes* on the ground that that case was not relied on in *Bonelli* and not cited by the Oregon courts below. *Ante,* at 377 n. 6. In *Bonelli,* the Solicitor General urged the Court to find federal law controlling because riparian lands patented by the United States were involved and, under *Hughes,* federal common law therefore controlled the riparian rights of the landowner. Memorandum for United States as *Amicus Curiae* 3–4, filed Jan. 2, 1973; and Memorandum for United States as *Amicus Curiae* 2–3, filed Sept. 20, 1973, in *Bonelli Cattle Co.* v. *Arizona,* O. T. 1973, No. 72–397. The petitioner took the same position. Brief for Petitioners 31–34 in *Bonelli Cattle Co.* v. *Arizona, supra.* The *Bonelli* Court did not reach this contention, noting that there was some doubt that the land in question was riparian at the time of the federal patent. 414 U. S., at 321 n. 11. In its eagerness to do away with *Bonelli's* result as well as its approach, however, today's opinion explicitly concludes that had *Bonelli* relied on the theory advocated by the petitioner there and the Solicitor General, it would now be rejected. *Ante,* at 371–372, 378–381.

Nevertheless, the majority suggests that *Hughes* might still control oceanfront property. *Ante,* at 377 n. 6. It is difficult to take seriously the suggestion that the national interest in international relations justifies applying a different rule to oceanfront land grants than to other grants by the Federal Government. It is clear that the States have complete title to the lands below the line of mean high tide. See *Borax, Ltd.* v. *Los Angeles,* 296 U. S. 10 (1935); 43 U. S. C. §§ 1301 (a)(2), 1311. These lands, of course, are the only place where the waters " 'lap both the lands of the State and the boundaries of the international sea.' " *Ante,* at 377 n. 6, quoting *Hughes* v. *Washington,* 389 U. S., at 293. There are no international relations implications in the ownership of land above the line of mean high tide. See Note, The Federal Rule of Accretion and California Coastal Protection, 48 S. Cal. L. Rev. 1457, 1472 (1975).

erty whose titles derive from the United States, deserve some explanation for the Court's change of course. Yet today's majority does not contend either that circumstances have changed since 1973 or that experience has shown *Hughes* and *Bonelli* to be unworkable. Nor does the majority attempt to explain why a result it finds so clearly commanded by our earlier cases was almost unanimously rejected by this Court twice in the last decade. We are left, then, with a mystery.

I respectfully suggest that the solution to this puzzle is not hard to find. In contrast to the *Bonelli* and *Hughes* Courts, the Court today decides a question the parties did not present,[2] brief,[3] or argue.[4] By so doing, the Court rules

---

[2] The cross-petitions for certiorari did not raise the question whether federal law governed the outcome; they were concerned only with whether the Oregon courts properly interpreted the governing federal common law.

The State's petition for certiorari in No. 76–567 stated the question presented as:

"In a typical situation of a navigable river flowing through two channels, where the smaller of the two channels after 20 years of erosive flooding 'suddenly' becomes the main channel, and the other channel eventually becomes unusable, does federal law deprive the public of title to the beds of both channels?"

In No. 75–577, Corvallis Sand & Gravel Co. raised two questions in its petition for certiorari:

"1. Does plaintiff, State of Oregon, have sufficient ownership to maintain statutory ejectment to recover possession of the bed of a navigable fresh water stream where its claim of ownership is based on sovereignty rather than grant and where there is no allegation pleaded and no proof that the public rights of navigation, fishery and related uses are being impaired or interfered with by defendant Corvallis Sand and Gravel Company?

"2. Does plaintiff, State of Oregon, have sufficient ownership to maintain statutory ejectment to recover damages for the removal of sand and gravel from the bed of a navigable fresh water stream where its claim of ownership is based on sovereignty rather than grant and where there

without the benefit of "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker* v. *Carr,* 369 U. S. 186, 204 (1962). The lack of illumination has caused the Court to choose the wrong path.

## I

The question the Court elects to decide in this case is whether a grant of riparian [5] land by the Federal Government is to be interpreted according to federal or state law. The Court holds that federal law governs only the determination of the initial boundaries of the grant; all other questions are to be determined under state law. This conclusion

is no pleaded allegation or proof that the public rights of navigation, fishery and related uses are being impaired or interfered with by the defendant Corvallis Sand and Gravel Company?"

[3] The parties' briefs faithfully mirrored their perceptions of the issues as presented in the petitions for certiorari. Thus, in No. 75–567, the State argued that the public interest requires recognition that the sovereign title in a riverbed is "full and complete" and that protecting that title requires that federal common law apply avulsion principles against a State only in very rare cases. Alternatively, the State argued that if classic avulsion principles applied, it still should receive title to the contested land. Corvallis Sand & Gravel responded by challenging the State's right to ownership of the riverbed under common law and by maintaining that the factfindings of the lower courts were both correct and not subject to review in this Court. In No. 76–577, the parties disputed Corvallis' contention that the State's title is limited to protection of navigation, fishery, and related uses and cannot be the basis for an ejectment action when those uses are not affected. Both parties assumed that federal common law governed the case.

[4] Counsel for the State of California, representing the *amici* States, argued that *Bonelli* should be overruled. Neither party addressed that issue except in response to questions from the Court. In response to those questions, counsel for both parties stated that federal common law should govern this case. Tr. of Oral Arg. 14, 28, 33.

[5] For convenience, I will use "riparian" in place of "riparian or littoral" for the remainder of this opinion.

depends on an unjustifiably limited interpretation of the meaning of a riparian grant.

It is undisputed that "the quality of being riparian" is perhaps "the land's 'most valuable feature' and is part and parcel of the ownership of the land itself." *Bonelli Cattle Co.* v. *Arizona,* 414 U. S., at 326, quoting *Hughes* v. *Washington,* 389 U. S., at 293. Cf. *New Orleans* v. *United States,* 10 Pet. 662, 717 (1836). In the natural course, however, a riparian boundary tends to move, a fact reflected in the common-law doctrines of accretion, avulsion, erosion, and reliction. Prior to today's ruling, federal grantees of riparian land, and holders under them, correctly understood that their titles incorporated boundaries whose precise location would depend on the movements of the water and on the federal common law.

There can be no doubt that the federal grantee's expectation that his grant would be interpreted according to federal law and his belief that federal law would recognize boundary shifts occasioned by changes in the course of the water bordering his land were well founded. One hundred forty years ago, this Court found it obvious that whoever had title to the land bordering water would have title to new land formed by alluvial deposits on the existing upland:

> "The question is well settled at common law, that the person whose land is bounded by a stream of water, which changes its course gradually by alluvial formations, *shall still hold by the same boundary,* including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded is subject to loss, by the same means which may add to his territory: and as he is without remedy for his loss, in this way, he cannot be held accountable for his gain." *Ibid.* (emphasis added).

This statement of the law was quoted by the Court in *County of St. Clair* v. *Lovingston,* 23 Wall. 46, 68 (1874).

The Court in *County of St. Clair* went on to note: "The riparian right to future alluvion is a vested right. *It is an inherent and essential attribute of the original property.*" *Ibid.* (emphasis added). Similarly, in *Shively* v. *Bowlby,* 152 U. S. 1 (1894),[6] the Court said:

> "The rule, everywhere admitted, that where the land encroaches upon the water by gradual and imperceptible degrees, the accretion or alluvion belongs to the owner of the land, is equally applicable to lands bounding on tide waters or on fresh waters, and to the King or the State as to private persons; *and is independent of the law governing the title in the soil covered by the water.*" *Id.,* at 35 (emphasis added).

Thus, the right to such additions[7] was part of the title which passed with the federal grant, cf. 3 American Law of Property § 15.27, p. 859 (A. J. Casner ed. 1952), and was protected by federal law. By holding that state law now governs the impact of changes in the course of the bordering water on a federal riparian grant, the Court denies that "a question which concerns the validity and effect of an act done by the United States" is "necessarily a federal question." *Borax, Ltd.* v. *Los Angeles,* 296 U. S. 10, 22 (1935). As far as federal law is concerned, a federal riparian grant

---

[6] Cited *ante,* at 375, 379–380.

[7] In *Bonelli,* the question was ownership of relicted land, which is land exposed by the subsidence of the water. The law of reliction is identical to the law of accretion. 3 American Law of Property § 15.26 (A. J. Casner ed. 1952). In the present case, the State claims title to land by virtue of the doctrine of erosion, the converse of accretion. Corvallis Sand & Gravel resists by arguing that the change in the river's course was not gradual, as erosion and accretion require, but sudden. A sudden, or avulsive, change does not effect a shift in boundaries. These doctrines form a coherent system. It would make no sense to hold that the federal doctrine of accretion must be applied to the benefit of a federal riparian grantee but that the federal doctrine of avulsion need not be applied.

is now understood to have incorporated a fixed rather than ambulatory boundary. *Ante,* at 376. The rule of *New Orleans* v. *United States, supra,* and *County of St. Clair* v. *Lovingston, supra,* is discarded along with *Bonelli* and *Hughes.*

The cases the Court concludes compel this dramatic shift do not even support it. *Wilcox* v. *Jackson,* 13 Pet. 498 (1839),[8] was an action of ejectment brought against the commander of a United States military post to recover part of the post. The plaintiff claimed under a state registration certificate. As the majority notes, the Court rejected that argument with the following language:

> "We hold the true principle to be this, that whenever the question in any Court, state or federal, is, whether a title to land which had once been the property of the United States has passed, that question must be resolved by the laws of the United States; but that whenever, according to those laws, the title shall have passed, then that property, like all other property in the state, is subject to state legislation; *so far as that legislation is consistent with the admission that the title passed and vested according to the laws of the United States."* *Id.,* at 517 (emphasis added).

The italicized language, on which the majority opinion makes no comment, explains why state law cannot control this case. Denial of the riparian holder's federal common-law rights to a changing boundary is not "consistent with the admission that the title . . . vested according to the laws of the United States."

In *Packer* v. *Bird,* 137 U. S. 661 (1891),[9] the Court held that it would construe federal grants of lands bordering navigable but nontidal waters as reaching only to the edge

---

[8] Cited *ante,* at 371, 372, 377.

[9] Cited *ante,* at 380.

of the stream. As it did in *Wilcox,* the Court in *Packer* noted that state law governs property once it has passed from the hands of the Federal Government. But the *Packer* Court, like its predecessor, also noted that the influence of state law is "subject to the condition that [state] rules do not impair the efficacy of the [federal] grants or the use and enjoyment of the property by the grantee." 137 U. S., at 669. Today's holding, which allows States to divest federally granted lands of their valuable quality of being riparian simply by refusing to recognize the titleholders' common-law rights, obviously removes this fundamental limitation on state power.

The Court also attempts to draw support from cases which affirm the proposition that the riparian title passed by a federal grant conveys title only to the water's edge, not to the middle of the stream. *Barney* v. *Keokuk,* 94 U. S. 324 (1877),[10] was a controversy over the ownership of land created when the city of Keokuk filled in land below the ordinary high-water mark. The plaintiff claimed title to the new land by virtue of his asserted ownership of the adjacent upland. The Court noted that "[i]t is generally conceded that the riparian title attaches to subsequent accretions to the land effected by the gradual and imperceptible operation of natural causes." *Id.,* at 337. Whether the same rule applied to land created out of the bed of the river, however, the Court considered a question of state law. The reason for this, as the Court explained, is that the riparian rights granted by the Federal Government extended only to the water's edge; if the States wish to grant the riparian owner rights beyond that point, they may do so at their own discretion. See *id.,* at 338. The Court transforms this conclusion that the States may, if they wish, enlarge the title granted by the Federal Government into support for the proposition that the States

---

[10] Cited *ante,* at 374, 379.

may also restrict that title. The transformation is impressive, but it is not logical.

The issue before the Court in *Shively* v. *Bowlby, supra,* was the title to land below the high-water mark of the Columbia River in Oregon. Shively claimed under a prestatehood grant from the United States, while Bowlby based his title on a subsequent grant from the State of Oregon. The Court held for Bowlby, finding that although Congress could have granted Shively title to the land he claimed,[11] it had not done so, nor had the State. 152 U. S., at 48–57.

As the majority indicates, the *Shively* Court engaged in a thorough review of earlier cases. It summarized its conclusions, in part, as follows:

> "The title and rights of riparian or littoral proprietors in the soil below [the] high water mark, therefore, are governed by the laws of the several States, subject to the rights granted to the United States by the Constitution."
> *Id.,* at 57–58.

But the *Shively* Court, unlike today's majority, realized that this proposition does not affect the rights of riparian holders to the benefits of the common-law doctrines governing boundary changes.[12] Those rights are "independent of

---

[11] The language in *Pollard's Lessee* v. *Hagan,* 3 How. 212 (1845), on which the majority heavily relies to prove that Congress had no such power, see *ante,* at 372–374, was dismissed as dictum by the *Shively* Court. See 152 U. S., at 28.

[12] The majority also quotes the *Shively* Court's statement that federal grants " 'leave the question of the use of the shores by the owners of uplands to the sovereign control of each State.' " *Ante,* at 379, quoting 152 U. S., at 58. It is clear from the context that by "shores" the *Shively* Court meant the land below the high-water mark. The State, as owner of that land, controls it. The Court did not suggest that the State was free to diminish the title of the upland owner by denying his right to an ambulatory boundary if the "shores" recede or the uplands grow.

the law governing the title in the soil covered by the water."
*Id.*, at 35. See *id.*, at 36.[13]

Thus, the cases refute the majority's contention that the results in *Hughes* and *Bonelli* sharply departed from prior law. Today's holding cannot, therefore, be based on interpretation of the meaning of the pre-statehood riparian grants under which Corvallis Sand & Gravel holds title, since the right to an ambulatory boundary was assumed to be part of the rights of a riparian grantee at the time the grants were made. Moreover, the cases also demonstrate that there is no constitutional basis for today's holding. The only constitutional question discussed in the majority opinion is the law governing the States' title to land beneath navigable waters, and the rights of the riparian holder are independent of that law.

II

Since today's ruling cannot be a matter either of constitutional law or of interpretation of the meaning of federal grants, it must be a choice-of-law decision. In deciding whether to formulate and apply a federal common-law rule, "normally the guiding principle is that a sig-

---

[13] The majority's assertion that the rule of *New Orleans* v. *United States*, 10 Pet. 662 (1836), and *County of St. Clair* v. *Lovingston*, 23 Wall. 46 (1874), is merely a description of the English common law, *ante*, at 380–381, n. 8, is belied by the *Shively* Court's affirmation of the independence of the riparian holder's rights from the law governing the lands beneath the water. The majority chooses not to discuss this aspect of *Shively*.

*Joy* v. *St. Louis*, 201 U. S. 332, 342, 343 (1906), cited *ante*, at 377, 380, does contain language which supports the conclusions reached by the majority. That case, however, did not involve lands in which a grantee of the United States held or claimed title. The land in that case was granted by Spain. Congress confirmed the grant, but by so doing it added nothing to the title conferred by Spain. See *Joy* v. *St. Louis*, 122 F. 524 (ED Mo. 1903), aff'd, 201 U. S. 332 (1906); *United States* v. *Washington*, 294 F. 2d 830, 833 (CA9 1961), cert. denied, 369 U. S. 817 (1962).

nificant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown." *Wallis* v. *Pan American Petroleum Corp.*, 384 U. S. 63, 68 (1966). See generally P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 756–832 (2d ed. 1973). In order to assure an informed presentation of federal policies and interests when faced with a choice between federal and state law, this Court in the past has invited the Solicitor General to file a brief *amicus curiae* expressing the views of the United States.[14] See, *e. g.*, *Wallis* v. *Pan American Petroleum Corp.*, 382 U. S. 810 (1965); *Yiatchos* v. *Yiatchos*, 372 U. S. 905 (1963). We followed this practice in both *Bonelli*, 409 U. S. 1022 (1972), and *Hughes*, 385 U. S. 807 (1966), and the Solicitor General participated as an *amicus* in both cases.

Today's majority has made no similar effort to inform itself about the impact of its ruling on the Federal Government. Indeed, the majority opinion does not even consider that issue, although it is normally central to a choice-of-law decision. As the opinion and result show, the only views the Court has received are those of the *amici* States, whose interests here are hostile to those of the United States.

I cannot, of course, know what the Solicitor General would have said had the Court indicated that it was considering a choice-of-law question and invited him to present the views of the Government. In both *Bonelli* and *Hughes*, however, the submissions for the United States as *amicus curiae* strongly urged the Court to hold that federal rather

---

[14] When the papers before the Court indicate that a choice-of-law question will be presented, the Solicitor General sometimes prepares an *amicus* brief on his own motion. See, *e. g.*, Memorandum for United States as *Amicus Curiae* and Brief for United States as *Amicus Curiae* in *Free* v. *Bland*, O. T. 1961, No. 205. In the present case, of course, the Solicitor General had no notice from the petitions for certiorari that the issue decided today would be raised. See n. 2, *supra.*

than state law governed the case. In *Bonelli,* the Government noted that its quiet enjoyment of the more than 200 miles of Colorado River shoreline it owned in Arizona had been threatened by some interpretations of the state court's decision. Memorandum for the United States as *Amicus Curiae* 1–2, filed Sept. 20, 1973, in *Bonelli Cattle Co.* v. *Arizona,* O. T. 1973, No. 72–397. The Government urged that the state-court opinion be given a narrow interpretation and affirmed as consistent with the applicable federal law. *Id.,* at 3–5.

In *Hughes,* the Government urged that the decision of the State Supreme Court be reversed. The Solicitor General explained that the Government considered that decision a serious threat:

"The decision is of broad consequence. It trenches on a significant element of title to realty acquired from the United States in the past and it materially curtails the nature of the title that the United States may convey in the future. . . . Equally important, it affects the powers of the United States with respect to more than 200 miles of Washington's coastline owned today by the federal government. Moreover, the principle of a fixed tideland boundary may readily be brought to bear on the property of the United States and its patentees in other coastal States. . . . Nor is there any apparent reason why, in Washington or elsewhere, the principle should be limited to tidelands; it can be applied with consistency of logic to the shifting banks of rivers and lakes owned by a State. . . . An inducement for the adoption and expansion of this principle is not lacking, since it tends inevitably to bring land into State ownership, and the sale of land thus acquired has been recognized as an attractive source of State revenue . . . .

"To be sure, the court below stated that it did not 'question the federal government's right over its own

property' . . . . [But] the court below failed to recognize that 'the federal government's right over its own property' embraces the right effectively to dispose of such property." Memorandum for United States as *Amicus Curiae* 3–5 in *Hughes* v. *Washington,* O. T. 1967, No. 15.

The Solicitor General explained that the decision in *Hughes* endangered the Government's ability to carry out congressional policy toward Indians, since the Government would no longer have been able to convey rights to a boundary adjacent to the sea if it turned over trust lands to the Indian beneficiaries. *Id.,* at 5–6; cf. *United States* v. *Washington,* 294 F. 2d 830 (CA9 1961), cert. denied, 369 U. S. 817 (1962). But the problem with the Indian trust lands was merely "exemplary" because the state decision in *Hughes*

> "restrains the government from disposing of the full measure of its title in connection with any program or policy which it may wish to pursue in the future. In sum, we do not believe that it can be said here, as it could in *Wallis* v. *Pan American Petroleum Corp.,* 384 U. S. 63, 68, that there is 'no significant threat to any identifiable federal policy or interest.' " Memorandum for United States as *Amicus Curiae* 6 in *Hughes* v. *Washington, supra.*

Today's decision necessarily has an even greater impact on federal interests, since it casts doubt on the Government's continued ownership "of the full measure of its title."

### III

One final word. *Stare decisis* should be more than a finesounding phrase. This is especially true for us, because "unless we respect the . . . decisions of this Court, we can hardly expect that others will do so." *Mitchell* v. *W. T. Grant Co.,* 416 U. S. 600, 629, 634 (1974) (Stewart, J., dissenting). Accordingly, "[a] substantial departure from precedent can

only be justified . . . in the light of experience with the application of the rule to be abandoned or in the light of an altered historic environment." *Id.*, at 634–635. Such admonitions are even more salient where land titles are concerned. Yet the majority has advanced neither experience nor changed circumstances to justify its interment of a 7–1 decision of this Court issued barely three years ago.

I am convinced that if the Court had considered the cases on which it relies in the light of an adversary presentation and had invited the Government to explain its interest in the application of federal law, the result today would be different. I therefore respectfully disssent.