# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-CT-01547-SCT

*DAVID M. COX, PAUL D. EAVENSON AND GULF FORESTRY ASSOCIATES, INC.*

*v.*

*F-S PRESTRESS, INC.*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 11/17/1997 |
| TRIAL JUDGE: | HON. JOHNNY WILLIAMS |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | WILLIAM H. JONES |
| ATTORNEY FOR APPELLEE: | ROBIN L. ROBERTS |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | REVERSED AND REMANDED - 1/18/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 2/8/2001 |

**EN BANC.**

**BANKS, PRESIDING JUSTICE, FOR THE COURT:**

¶1. This case comes to this Court on writ of certiorari to determine whether the change in a river's channel effected a change in the boundary between private property owners. The chancellor decided that the boundary changed by the laws of accretion, and his decision was upheld by the Court of Appeals. For reasons discussed below, we reverse and remand for further proceedings not inconsistent with this opinion.

## I.

¶2. The adverse parties are adjoining landowners who have conflicting claims of ownership to approximately 17 acres of land situated on the Bouie River in Forrest County. The disputed land was once part of a peninsula which jutted into a westerly bend of the river. The river flowed around the peninsula and formed its western boundary. This formation of land and river resembled the typical "horseshoe" or "ox-bow" bend of a river meander. The disputed land was attached by the narrow neck of the peninsula to a larger tract of land to the east. This neck of land was known as the "falls," and water flowed over it in times of high water on the river.

¶3. The litigants acquired title of record by deeds which described the river as the boundary of their properties. In 1957, F-S Prestress, Inc. ("Prestress") acquired title of record to lands described as being west of the Bouie River. In 1979, David M. Cox and Paul D. Eavenson acquired title of record to lands described as being east of the Bouie River. The predecessors in title to Cox and Eavenson also claimed title of record to lands described as being east of the river.

¶4. Until the events described below, the peninsula containing the disputed land lay east of the river, collared in the ox-bow. This land was not readily accessible. It was used for timber growing, and there was testimony that the predecessors in title of Cox and Eavenson had harvested the timber at times.

¶5. At some point in time, about 1960 according to the chancellor's findings of fact, the river created a cut-off, a new main channel running through the falls area in the neck of the ox-bow. The disputed land was now situated west of the river channel, with the waters of the "new" main channel of the river completely separating it from formerly contiguous lands to the east. On the west margin of the disputed land lay the remnant of the "old" channel, now reduced to a slough. This slough is under water in places and dry in places. Although the disputed land is sometimes referred to as an "island," it appears that this "island" is completely surrounded by water only in times of high water, at which times the slough completely fills with water.

¶6. The litigation began after Cox and Eavenson cut timber from the disputed land in 1993. Prestress filed suit in Forrest County Chancery Court to quiet title to the land and to seek damages for the timber. Prestress asserted that the east boundary of its property was the Bouie River, which would include all of the disputed land, and asserted further that the disputed land had been east of the Bouie River since the time Prestress acquired the property. The complaint described the change in course of the river as an accretive process which changed the boundary lines of the property. Alternatively, Prestress claimed ownership by adverse possession. Cox and Eavenson defended on the basis of their own title and asserted that the river changed its channel by process of avulsion.

¶7. Evidence was introduced at trial concerning among other things the history of record title, the changes in the river, the use and possession of the land, and payment of taxes. The chancellor ultimately determined that the decisive issue was the process by which the river changed its channel. In that regard, the most significant witnesses were Don Williams and Addie Clinton Holleman.

¶8. Williams, a professor of geography at the University of Southern Mississippi, testified that the change in the river occurred over a ten year period from 1942-1952. He described the process as one which occurred due to the differences in velocity of the river's current against the outer and inner banks of the ox-bow bend. As he explained it, the water flowed more rapidly on the outside bend, that is, against the neck of the "falls" area. The pressure of this rapidly flowing water gradually eroded the land in the bend. Meanwhile, the water flowed more slowly in the inside curve of the bend, allowing deposits of material on the river's west bank. Thus, he testified, the cut-off was gradually carved while the old channel of the river was gradually restricted. As a result the river created a new channel through the neck of the bend, a shortcut for the southerly flow of its waters, and abandoned the old channel. The old channel of the original meander was gradually in-filled.

¶9. Williams described this process as one of accretion and, although he described the process as one which occurred over a period of ten years, he also testified that there came a point in time when the remaining material in the bend would have been removed "rather rapidly." He stated that the new channel became the main channel of the river "very rapidly" after the cut-off occurred.

¶10. Holleman lived in the area of the disputed land and testified regarding her memory of the same events which Williams described. Holleman's family owned the land east of the Bouie River in the period from 1946 to 1979. She described the formation of the new channel as a process occurring over several years. She testified that her family used the disputed land as a picnic area until the 1970's. It was then, she said,

that a flood caused the falls area to be completely covered by water.

¶11. The chancellor found from the evidence that the river cut through the peninsula between the years 1942 and 1960 and formed its new, larger channel located to the east of the old channel. He found further that the formation of the new, larger channel transformed the peninsula into somewhat of an island parcel, with water running completely around the parcel in the old channel only occasionally. This process, the chancellor determined, was one of accretion. Therefore, he ruled that Prestress had acquired title to all the disputed land because it is now situated west of the new main channel of the Bouie River. The chancellor found that it was unnecessary to decide Prestress's claim of adverse possession. Prestress was awarded $27,118.52 in damages for the cutting of timber, pursuant to Miss. Code Ann. § 95-5-10 (1994).

¶12. On appeal by Cox and Eavenson, the Court of Appeals of Mississippi initially affirmed the chancellor by unanimous vote. On petition for rehearing, however, the Court of Appeals split evenly. Four judges would have reversed upon a finding that the severance of the island was an avulsion, and would have remanded the case so that the issue of adverse possession could be decided.

¶13. Cox and Eavenson petitioned for writ of certiorari. Their position is that the chancellor and the Court of Appeals have misapplied the laws of Mississippi on accretion and avulsion to the facts of this case. The question for review is whether the courts below were correct in deciding that the boundaries of the disputed land were changed by process of accretion.

## II.

¶14. The chancellor's determination that this land boundary changed by process of accretion is a finding of fact. More precisely, the chancellor's determination is an application of the body of common law on accretion and avulsion to the facts of this case. This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *Griffin v. Armana*, 687 So.2d1188, 1192 (Miss. 1996).

## III.

¶15. This Court has established a body of case law applicable to lands bounded by waters. The law in Mississippi, as to boundaries on freshwater streams above the ebb and flow of the tides, is that regardless of the size or navigability the owners of abutting land own to the thread or thalweg of the stream. *Wilson v. St. Regis Pulp & Paper Corp.*, 240 So.2d 137, 139 (Miss. 1970). When a stream is the boundary between properties, the boundary shifts with the gradual vagaries and changes in the stream, but if there is a sudden or avulsive change in its course, the boundary remains fixed to the location of the stream prior to the avulsion. *Robinson v. Humble Oil & Ref. Co.*, 253 Miss. 602, 623, 176 So.2d 307, 316-17 (1965).

¶16. Accretion has been defined as an addition to riparian land made by the water to which the land is contiguous, so gradually and imperceptibly that, though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on. *Sharp v. Learned*, 195 Miss. 201, 215, 14 So.2d 218, 220 (1943). "Ordinarily, accretion means the gradual deposit of alluvial soil upon the margin of the water or the gradual recession of the water." *Harrison County v. Guice*, 244 Miss. 95, 108, 140 So.2d 838, 842 (1962), *overruled on other grounds*, *Mississippi State Hwy. Comm'n v. Gillich*, 609 So.2d 367 (1992). Avulsion, on the other hand, is a change in a boundary

by stream so rapidly or so suddenly made, or in such a short time, that the change is distinctly perceptible or measurably visible at the time of its progress. *Sharp,* 195 Miss. at 215, 14 So 2d at 220.

¶17. A presumption of accretion can be entertained in a proper case, depending on the lay of the land, length of time involved, and location and direction of the river. *United States Gypsum Co. v. Reynolds*, 196 Miss. 644, 659, 18 So.2d 448, 449 (1944). This presumption depends largely on a rule of parallelism. That is, that accretion ordinarily occurs when alluvium builds as a stream migrates roughly in parallel lines across the landscape. The presumption is negated where, as here, the river moves at right angles to the former channel. *Sharp*, 195 Miss. at 215-18, 14 So.2d at 220-21.

¶18. The law of accretion and avulsion is based on public policy. Perhaps the most practical reason offered for the rule of accretion, which changes boundaries, is to give a riparian owner the benefit of access to water. *Guice*, 244 Miss. at 108, 140 So.2d at 842-43. It has been said that the rationale for the law of avulsion is to mitigate the hardship of a change in title resulting from a sudden movement of a river. *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 327, 94 S. Ct. 517, 38 L. Ed. 2d 526 (1973), *overruled on other grounds*, *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 97 S. Ct 582, 50 L. Ed. 2d 550 (1977).

¶19. As noted above, the chancellor found that over an eighteen year period the river created a cut-off by gradually eroding the neck of the peninsula. An island was thus created, as the disputed parcel was separated from the larger tract to the east by the new main channel of the river. The chancellor found that the change in the river was caused by accretion and that the boundaries of the properties changed as a result.

¶20. The instant case presented the chancellor with a somewhat novel factual situation, at least insofar as cases decided by this Court. This case presents some facts which are characteristic of accretion, but other facts which are characteristic of avulsion.

¶21. Undoubtably, accretion was involved to some degree in this process. The soil in the neck of the peninsula was lost to the adjacent lands by laws of accretion as the neck was eroded and washed into the river to be deposited elsewhere. This alluvium was distributed to the banks of the river by process of accretion. This is not in dispute.

¶22. Notwithstanding the chancellor's finding that the disputed parcel was detached over time, we disagree with his ultimate conclusion that the boundaries of the disputed land were changed under the law of precedents applied to these facts. By careful analysis of the applicable body of common law, we conclude that the Bouie River changed its position relative to the disputed land by an act of avulsion.

¶23. If speed of the entire process was the only factor to consider, we would be compelled to hold that the Bouie River changed its course in relation to the disputed land by process of accretion. Accretion occurs gradually and imperceptibly. *Sharp,* 195 Miss. at 215, 14 So. 2d at 220. But, as suggested by *Wilson*, 240 So. 2d at 138-39, it is the change in the thalweg of a stream which effects a change in boundaries under the law of accretion. The testimony here was that the new main channel, the thalweg, formed very rapidly after this land was cutoff by the river, whether or not this may have happened in time of flood. These facts suggest that an avulsion occurred.

¶24. Furthermore, this cannot be accretion if the other elements of an accretive process are considered.

The disputed land was left intact, readily identifiable as the same land existing before the process began. The land was not formed by alluvial deposits on the west bank of the river. It did not emerge from gradual recission of the water. This land was not washed over or eroded during the process. The disputed land existed in the same form, before the process began and after the process was completed.

¶25. In circumstances such as this, both federal and state case law recognize an exception to the generalized definitions of accretion. That exception, as stated in *Davis v. Anderson-Tully Co.*, 252 F. 681, 685 (8th Cir. 1918), is this:

> when a navigable stream changes its main channel of navigation, not by creeping over the intermediate lands between the old channel and the new one, but by jumping over them or running around them and making or adopting a new course, the boundary remains in the old channel subject to subsequent changes in that channel wrought by accretion and erosion while the water in it remains a running stream, notwithstanding the fact that the change from the old channel to the new one was wrought gradually during several years by the increase from year to year of the proportion of the waters of the river passing over the course which eventually became the new channel, and the decrease from year to year of the proportion of its waters passing through the old channel until finally the new channel became the main channel of navigation.

*Accord*, *Commissioners v. United States*, 270 F. 110, 113 (8th Cir.1920); *State v. Ecklund*, 23 N.W.2d 782, 789 (Neb.1946). This rule is analogous to the island rule, which provides that "if there is a divided river flow around an island, a boundary once established on one side of the island remains there, even though the main downstream navigation channel shifts to the island's other side." *Louisiana v. Mississippi*, 516 U.S. 22, 25, 116 S. Ct. 290, 133 L. Ed. 2d 265 (1995).

¶26. We find under the facts of this case that the change in course of the Bouie River was an act of avulsion which did not, in and of itself, affect title to the disputed land. The judgments of the Court of Appeals and the Forrest County Chancery Court are reversed. Because the chancellor did not adjudicate title based on Prestress's claim of adverse possession, this matter is remanded to the Forrest County Chancery Court for further proceedings on that issue.

¶27. **REVERSED AND REMANDED.**

> **McRAE, P.J., SMITH, MILLS, WALLER, COBB AND EASLEY, JJ., CONCUR. PITTMAN, C.J., AND DIAZ, J., NOT PARTICIPATING.**