# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-01666-SCT

*WILLIE L. WILLIAMS, JR.,*
*AND THE MINOR CHILD,*
*MARCUS A. WILLIAMS,*
*BY AND THROUGH HIS NEXT*
*FRIEND, WILLIE L. WILLIAMS, JR.*

*v.*

*ANGELA G. WILLIAMS,*
*WILLIE L. WILLIAMS, JR.,*
*AND DAN HUBBARD*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/1/2001 |
| TRIAL JUDGE: | HON. GEORGE WARD |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | WALTER KEVIN COLBERT |
| ATTORNEY FOR APPELLEES: | STANLEY N. MERRITT |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND REMANDED - 04/24/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1.     Willie L. Williams, Jr., appeals a judgment of the Adams County Chancery Court which dismissed his and Marcus A. Williams' petition to determine Marcus' paternity, thereby effectively requiring Willie to continue paying child support for someone who is not his child.  Finding that result fundamentally unfair, we reverse and remand.

## FACTS AND PROCEDURAL HISTORY

¶2.    Willie L. Williams, Jr., and Angela G. Williams married in 1988 and divorced in 1996. The couple separated in October of 1993, and Angela gave birth to Marcus A. Williams on August 22, 1994. When Marcus was approximately one month old, he and Angela moved from their home in Dallas, Texas, to Natchez, Mississippi. Willie and Angela were subsequently divorced on November 25, 1996. In the divorce decree, both Angela and Willie swore that Marcus was their son. Willie was never ordered to pay child support until 1999, when the Mississippi Department of Human Services instituted a support action against Willie in Texas on Marcus' behalf.

¶3.    Willie and Marcus never really had much of father/son relationship, for they had only visited each other no more than four times in seven years. On one of these visits, Willie noticed a lack of similarity of physical features between Marcus and himself. Suspecting that Marcus might not be his son, Willie had a paternity test conducted in September of 1999 which concluded that Marcus was, in fact, not his son.

¶4.    Willie filed a motion in Adams County Chancery Court to modify his and Angela's divorce decree to reflect Willie's nonpaternity of Marcus. The motion was denied on the grounds of res judicata and collateral estoppel because of Willie's attestation of paternity in the divorce decree. The chancellor also concluded that public policy prohibited the bastardizing of a legitimate child and that it was in Marcus' best interest that Willie continue support payments. Willie never appealed this ruling.

¶5.    Instead, Willie filed a petition as next friend of Marcus against himself, Angela, and Dan Hubbard, a man whom Willie thought was Marcus' biological father. The chancellor ordered Willie, Angela, Marcus, and Hubbard to undergo DNA testing. The chancellor also appointed Eileen Maher to serve as guardian ad litem.

¶6.    The DNA testing confirmed the earlier test that Willie was not Marcus' father. However, the test also excluded Hubbard. The chancellor found that the testing conclusively excluded Hubbard as Marcus' father and consequently dismissed him.

¶7.    At the hearing, Angela testified that she had engaged in a one-time sexual encounter with a man other than Willie and Hubbard around the time that Marcus was conceived but could not remember his name. She could, however, remember where he worked and where he lived. The chancellor was convinced that Angela was not withholding Marcus' biological father's name.

¶8.    The guardian ad litem, on the other hand, was convinced that Angela knew the biological father's name. She recommended that Willie be relieved of his support obligation because Marcus clearly had a right to know his biological father and concluded that forcing Willie to continue paying was a perpetration of fraud upon Marcus.

¶9.    Notwithstanding the clear scientific evidence of nonpaternity and the guardian ad litem's recommendations, the chancellor dismissed Willie's petition and imposed court costs and the cost of DNA testing on him. Willie appeals, arguing that the results of the DNA testing rebutted the presumption of paternity.

## STANDARD OF REVIEW

¶10.   We will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, applied an erroneous legal standard, was manifestly wrong, or was clearly erroneous. *Cox v. F-S Prestress, Inc.*, 797 So. 2d 839, 843 (Miss. 2001); *Holloman v. Holloman*, 691 So. 2d 897, 898 (Miss. 1996).

## DISCUSSION

¶11.   The chancellor justified his holding on the grounds that maintaining the status quo was in Marcus' best interest and that allowing Marcus to bastardize himself would only benefit Willie's interests. We agree with Willie that the presumption of paternity has been effectively rebutted and that it would be unjust and unfair to require him to continue paying child support.

¶12.   Our recent decision in *M.A.S. v. Mississippi Department of Human Services*, 2003 WL 40469 (Miss. 2003), is on point and dispositive of this case. In *M.A.S.*, M.A.S. agreed in a paternity decree when he was seventeen years old that he was the father of S.M. and agreed to pay child support. 2003 WL 40469 at *1. He later married another woman and had another child. *Id.* That child subsequently died and, to determine the child's wrongful death heirs, a Lawrence County chancellor ordered DNA testing. *Id.* The tests concluded that M.A.S. was not S.M.'s biological father. *Id.*

¶13.   With these results, M.A.S. sought to have the prior paternity order set aside. The chancellor refused to grant M.A.S. relief because he had waited nine years to contest paternity, and res judicata precluded review of that prior stipulation of paternity. *Id.* The Court of Appeals affirmed. *Id.*

¶14.   On writ of certiorari, we reversed the Court of Appeals and held that M.A.S.'s failure to contest paternity until S.M. was nine years old did not prejudice S.M.'s mother because she received child support payments from the wrong person. We also stated:

4

> In our opinion, finality should yield to fairness here. M.A.S. has paid child support for someone else's child for over ten years. He will be obligated to support that child for many more years unless the flawed paternity and child support order is vacated. The chancellor's refusal to withdraw the paternity order in the face of unrefuted proof that M.A.S. is not the child's father, was an abuse of discretion.

*Id.* at *4. We concluded that forcing M.A.S. to continue making child support payments when S.M. was shown not to be his child would result in a manifest injustice.

¶15.    This conclusion of allowing men to be relieved of prior support obligations upon a showing of irrefutable proof of nonpaternity finds support in other jurisdictions. In *NPA v. WBA*, 380 S.E.2d 178 (Va. Ct. App. 1989), the wife, NPA, became pregnant during the couple's separation. She told her husband, WBA, that she had sexual intercourse with another man during that time. *Id.* at 179. The couple later reconciled, and, at the child's birth, the wife told her husband that if he had any doubts about his paternity he should take a blood test. He accepted her statement that he was the father, did not take the blood test, and treated the child as his own throughout the couple's marriage. *Id.*

¶16.    When the wife filed for divorce four years later, the husband alleged that he was not the father of that child and a later-born child. *Id.* at 180. Tests revealed that he was not the father of the first child. In affirming the trial court's holding that the husband was not liable for support, the Virginia Court of Appeals noted:

> We are mindful that the child, who well may have an affinity for the husband as his father, is an innocent victim of his parent's problems. However, in the absence of consanguinity, legal adoption, or a knowing and voluntary assumption of the obligation to provide support, the law will not compel one who has stood in the place of a parent to support the child after the relationship has ceased.

*Id.* at 181. *NPA* demonstrates that courts will terminate support obligations even when the child and his purported father have established a relationship infinitely more substantial than the one between Marcus

and Willie. *See, e.g., In re Bethards*, 526 N.W.2d 871 (Iowa Ct. App. 1994) (finding sufficient change in circumstances to warrant modification of divorce decree and cease child support obligation when testing established nonpaternity). *See also* Theresa Glennon, *Somebody's Child: Evaluating the Erosion of the Marital Presumption of Paternity*, 102 W. Va. L. Rev. 547, 577-82 (2000).

¶17.    The dissent discounts the binding force of *M.A.S.* by distinguishing it solely on procedural grounds. However, *M.A.S.* clearly addresses the merits by recognizing the inequity of requiring child support where paternity is clearly not established: "A manifest injustice will result if M.A.S. is required to continue making child support payments for a child which unquestionably is not his." 2003 WL 40469 at *4. *M.A.S.* clearly held that a man is not liable and should not be required to provide support payments for a child that is not his.[1]   We believe that the best interest of the child, in the factual scenario presented, is to know the identity of the natural father. *See Dep't of Human Servs. v. Smith*, 627 So. 2d 352, 353 (Miss. 1993) (holding that "[p]ublic policy dictates that a determination of paternity is in a child's best interest").

## CONCLUSION

¶18.    As in *M.A.S.*, we refuse to sanction the manifest injustice of forcing a man to support a child which science has proven not to be his. Therefore, the judgment of the Adams County Chancery Court dismissing the petition to determine paternity filed by Willie L. Williams, Jr., and Marcus A. Williams is reversed given the conclusive scientific proof of nonpaternity, and this case is remanded for further proceedings in accordance with this opinion and our prior opinion in *M.A.S. v. Mississippi Department of Human Services*.

---

[1]We do not hold that a man who is not a child's biological father can be absolved of his support obligations in all cases. Those who have adopted the child or voluntarily and knowingly assumed the obligation of support will be required to continue doing so. *See NPA*, 380 S.E.2d at 181.

6

¶19.    **REVERSED AND REMANDED.**

**SMITH, P.J., COBB, DIAZ, EASLEY AND GRAVES, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY. PITTMAN, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON, J.**

**PITTMAN, CHIEF JUSTICE, DISSENTING:**

¶20.    This Court's opinion in ***M.A.S. v. Mississippi Department of Human Services***, 2003 WL 40469 (Miss. 2003), does not control the outcome of this case. I fear that the majority's error in relying upon this case for support of its conclusion will work irreparable damage to our standard of review and the presumption of legitimacy found in our case law. In my view, the majority fails to demonstrate how the chancellor erred. Therefore, I must respectfully dissent.

¶21.    Two things distinguish the instant case from ***M.A.S.***: (1) in ***M.A.S.***, the father attacked the child support judgment directly, using M.R.C.P. 60(b)(6) and its broad powers in equity in an attempt to gain untimely relief from an earlier judgment; and (2) in ***M.A.S.***, the father was not married to the mother at the time of conception or birth. In the instant case, Willie Williams ultimately sought release from his child support payments under the theory that he could prove the identity of the biological father; a venture which he failed to complete. Willie Williams was also married to Angela Williams at the time of Marcus's conception and birth, a fact which entitles Marcus to a presumption of legitimacy in our courts. Here, unlike ***M.A.S.***, Willie gains access to the courtroom not because he challenges his divorce decree or child support judgment, but because this Court has previously held that a child is not subject to procedural limitations which bind his presumed parents once a judgment is final.[2] These differences should not be

_____

[2] I pause to note that both cases cited by the majority from sister jurisdictions involve a presumed father challenging paternity in a divorce proceeding or seeking relief from a divorce decree.

7

overlooked by the majority given the importance of this case. Each difference is substantial enough to forsake any reliance upon *M.A.S.* in the discussion of the merits of this case, as I will explain below. What must first be discussed is the correct standard of review.

¶22.    The majority does not mention it, but there can be little doubt that the controlling standard we employ when reviewing paternity challenges involving children born to a marriage is the best interest of the child. *Baker ex rel. Williams v. Williams*, 503 So. 2d 249, 252 (Miss. 1987). *See also Rafferty v. Perkins*, 757 So. 2d 992 (Miss. 2000); *R.E. v. C.E.W.*, 752 So. 2d 1019 (Miss. 1999); *Karenina ex rel. Vronsky v. Presley*, 526 So. 2d 518 (Miss. 1988). Neither case cited by the majority as its source for its "abuse of discretion, application of erroneous legal standard, manifestly wrong, or clearly erroneous" standard of review concerns child custody, support, or paternity. Nor does the majority pay much service to its stated standard in its opinion, reversing instead because the judgment below sanctions a fundamentally unfair result. Maj. Op. at ¶¶ 1, 17. Given the nature of the parties and the potential financial impact of the majority's determination, it is imperative to apply the correct standard of review. It is the foundation of the chancellor's correct judgment.

¶23.    Beginning with the first reason why *M.A.S.* should not be relied upon by the majority as controlling authority here, it is important to note this case began as a suit to establish the paternity of Dan Hubbard; similar in procedure to that discussed in *Baker ex rel. Williams* and the other cases mentioned above. The majority correctly relates that Willie Williams has abandoned his appeal from the judgment against him when he challenged the admission of paternity found in the divorce decree pursuant to M.R.C.P. 60(b)(6). *See* Maj. Op. at ¶ 4. No relief from that ruling can be granted here. In this case, the question below was not whether Willie Williams had rebutted the presumption of paternity, but whether it was in Marcus's best interests to have Hubbard declared his father in the face of overwhelming evidence that Hubbard was not

8

his father. The answer is clearly no. Having dismissed Hubbard as a party, the chancellor was left without statute or precedent to guide his next move. *See* Miss. Code Ann. §§ 93-9-1 to -75 (Rev. 1994 & Supp. 2002). The chancellor recognized this, and in his order dismissing the suit he utilized the correct standard of review and found that no such creature as a suit to disestablish paternity existed, especially one brought in the child's name by the presumed father where the identity of the biological father was not known.[3] Even using the majority's own standard of review to answer the true question before the court below, I cannot see how the chancellor abused his discretion, utilized an incorrect legal standard, was manifestly wrong or clearly erroneous. Therefore, using either standard discussed above, the chancellor got it right. Since the majority relies so heavily upon *M.A.S.* as controlling authority, I will discuss the standard employed there and explain why it does not control the analysis of the instant case.

¶24.    In *M.A.S.*, the stated standard of review was as follows:

> A trial judge's refusal to grant relief under Rule 60(b) is subject to review under an abuse of discretion standard. *Telephone Man, Inc. v. Hinds County*, 791 So.2d 208, 210 (Miss.2001); *Moore v. Jacobs*, 752 So.2d 1013, 1015 (Miss.1999). This Court has stated that "[r]elief under Rule 60(b)(6) is reserved for extraordinary and compelling circumstances," and that the Rule is a "grand reservoir of equitable power to do justice in a particular case." *Briney v. United States Fid. & Guar. Co.*, 714 So.2d 962, 966 (Miss.1998). But "Rule 60(b) is not an escape hatch for litigants who had procedural opportunities afforded under other rules and who without cause failed to pursue those procedural remedies." *City of Jackson v. Jackson Oaks Ltd. P'ship*, 792 So.2d 983, 986 (Miss.2001). "Further, Rule 60(b) motions should be denied where they are merely an attempt to relitigate the case." *Stringfellow v. Stringfellow*, 451 So.2d 219, 221 (Miss.1984).

---

[3]It is noteworthy that a bill died in committee in our House of Representatives this year which would have strengthened the presumption of legitimacy despite genetic testing. *See* H.B. 1319, 2003 Regular Legislative Session.

*M.A.S.*, 2003 WL 40469, at *3. The last three sentences bear emphasis. *M.A.S.* itself represents an alternate procedural opportunity for attacking paternity by a presumed or putative father. This is the first method by which Willie Williams sought relief, but he mysteriously failed to pursue this method beyond the chancellor's ruling against him. The instant case represents precisely the situation discussed in the last sentence from the above standard of review. That sentence cautions against granting relief in these circumstances. This is Willie Williams's second bite at the apple, disguised as a suit to establish paternity. Therefore, these circumstances are not nearly as extraordinary or compelling as required to reverse the chancellor below. The facts, given the true question before the trial court as I have explained above, do not support a finding the chancellor abused his discretion, nor do they support the contention that *M.A.S.* is controlling authority.

¶25.    Furthermore, where the standard of review from Rule 60(b) has intersected with the best interest of the child standard, the best interests of the child has been found to be preeminent. As eloquently explained in *Mississippi Department of Human Services v. Helton*, 741 So. 2d 240, 242 (Miss. 1999):

> Protecting the best interests of a child is the paramount concern in actions to which a child is a party. *Lauderdale County Dept. of Human Services v. T.H.G. and L.D.G.*, 614 So.2d 377, 383 (Miss.1992). It is "the goal of utmost import in any judicial proceeding." *Dept. of Human Services v. Jones*, 627 So.2d 810, 811 (Miss.1993).
>
> In *Dept. of Human Services v. Jones*, 627 So.2d at 810, this Court considered the failure of the DHS to file timely motions for blood testing. The Court discussed the "inflexible public policy" of protecting a child's best interests, *id.* at 811, and held that "protection of the children's best interests as expressed in this state's policy statutes must override any concern over timeliness." *Id.* at 812.

10

The chancellor in *Helton* did indeed abuse his discretion when the best interest of the child took a back seat to Rule 60(b)'s abuse of discretion standard. Even if the majority insists upon using the incorrect standard of review found in *M.A.S.*, it must acknowledge that the best interest of the child carries the day.

¶26. Therefore, I must conclude that the best interest of the child is the primary and controlling standard of review to be employed here. Since Willie Williams is not presently attacking the child support judgment or the divorce decree, he is not entitled to have this Court exercise its broad equitable powers to meet his ends. Thus, *M.A.S.* is neither controlling nor on point on this matter. Marcus, on the other hand, is entitled to all the protection due him considering his best interests. As this was the standard employed by the chancellor, his judgment is correct and should be affirmed.

¶27. The second reason why *M.A.S.* does not control here is the majority inadvertently erodes the common law presumption that a child born during a marriage is a product of that marriage absent proof beyond a reasonable doubt to the contrary. M.A.S. was not married to the mother of the child; Willie Williams was. Although the majority in *M.A.S.* used beyond a reasonable doubt language, it was not necessary as no presumption of legitimacy ever attached to the child. *M.A.S.*, 2003 WL 40469 at *4. M.A.S. never had to show beyond a reasonable doubt that he was not the child's father; all he needed to demonstrate was that he was entitled to relief under Rule 60(b). Willie Williams must go further. *Baker ex rel. Williams*, 503 So. 2d at 253.

¶28. Since the question before the chancellor below was not whether Willie Williams rebutted the presumption of paternity, this proposition was not tested by the adversarial process. This Court does not have to state at the present time whether there is sufficient evidence in the record to support Willie's claim of nonpaternity. All that is necessary is to reverse and remand this case with instructions to the chancellor

11

as to what question he is to answer: for example, whether it is in Marcus's best interest to have Willie's nonpaternity adjudicated in this suit or whether Willie has proven his nonpaternity beyond a reasonable doubt. This can and should be done without reference to *M.A.S.* because of the effects such a reference would have upon our presumption of legitimacy. Therefore, *M.A.S.* is not controlling authority here.

¶29.    As illustrated in this case, a child can intentionally declare himself illegitimate and forfeit his support payments at the instigation of his father whose monetary interests are radically different from his own. I realize that our law has seen fit to allow the first, but in those cases allowing the child to be declared illegitimate, the child's best interest was scrupulously guarded. The chancellor acted similarly below, but the majority does not do so now. I cannot find any support in the record for the conclusion that it is in Marcus's best interest to have Willie Williams's nonpaternity adjudicated under the circumstances of this case. Such would result in the loss of his child support. I conclude that the majority's reversal of the chancellor implicitly sanctions the use of a procedural gimmick to acquire standing to challenge paternity, and I cannot support such result. I would affirm the chancellor.

**CARLSON, J., JOINS THIS OPINION.**